Myrta Clair Hayzlett, *Administratrix, etc. v.* Westvaco Chlorine Products Corporation

(No. 9453)

Submitted April 13, 1943.   Decided May 11, 1943.

*Koontz & Koontz* and *Harry B. Lambert,* for plaintiff in error.

*W. Hayes Pettry,* for defendant in error.

Riley, President:

Myrta Clair Hayzlett, administratrix of the estate of R. H. Hayzlett, deceased, instituted in the Court of Common Pleas of Kanawha County her action for the alleged wrongful death of her decedent against Westvaco Chlorine Products Corporation, decedent's employer. At the conclusion of plaintiff's evidence, the trial court directed a verdict for the defendant and entered judgment thereon. This writ of error is prosecuted to a judgment of the Circuit Court of Kanawha County reversing the trial court's judgment.

The declaration, containing four counts, alleges that decedent died on July 14, 1940, while on active duty as an assistant carpenter in the sulphur department of defendant's plant in South Charleston. The first count alleges that defendant furnished decedent an insecure, unclean, unsafe and unsuitable place in which to work; the second alleges that defendant, knowing decedent was subjected during his employment to exposure to sulphur dioxide gas and poisonous and noxious gases, smoke and fumes, neglected to warn and instruct decedent as to the hazards incident to his employment; the third count alleges that, though under a duty to do so, defendant neglected to supply decedent with good, proper, safe and suitable machinery, tools, and appliances to be used by him in his said employment; and the fourth count alleges that defendant neglected to provide sufficient ventilation in the part of the plant where decedent was required to work.

The trial court, as his remarks to the jury in directing a verdict reflect, entertained the opinion that plaintiff had failed to prove either actionable negligence, or that decedent's death resulted from his exposure to sulphur dioxide gas or other noxious gases or fumes; and the circuit court, in a written opinion made a part of the record, held that the question of negligence, as presented by the instant record, was properly one for the jury, and that a sufficient causal connection between the inhalation of poisonous gases and decedent's death had been established if the death certificate, showing the cause of death as due to coronary thrombosis, had been introduced in evidence instead of a stipulation between the parties that such certificate would show that death resulted therefrom, and remanded the case for a new trial in order to permit the introduction of such certificate, citing in support of his action *Laas* v. *Lubic*, 101 W. Va. 546, 133 S. E. 142; *Campbell* v. *C. & O. R. R. Co.*, 111 W. Va. 358, 163 S. E. 31; and Code, 16-5-21, the last providing, in substance, that the facts set forth in a properly certified death certificate are *prima facie* correct.

The record discloses that decedent was employed by defendant at its chemical plant in South Charleston, as an assistant carpenter from December 15, 1939, to the time of his death. From January 1, 1940, according to his work record, he served in defendant's sulphur department intermittently for a total of thirty-six hours, and during the same period had passed through the sulphur plant seventeen times going to the building in which he worked, which is known as the "Zaremba" building. His work sheet likewise discloses that he worked during that period for quite a number of hours in a building in which chlorine gas was manufactured, but the record does not disclose that he had been subjected to exposure to chlorine gas.

There is evidence that decedent was in good health until two and a half or three months prior to his death, when he began to cough and sneeze, his eyes became irritated, he suffered with sore throat and larnyx, became very thirsty, began to tire easily under exertion, suffered pains in his chest, and loss of appetite, did not sleep well, and his urination was impaired. During the afternoon of July 10, 1940, he was exposed to sulphur dioxide fumes, and was required to leave his place of work in order to get fresh air. Decedent's wife, Myrta Clair Hayzlett, testified that she laundered his working clothes twice a week for at least two months prior to his death, and on these occasions the clothes had on odor of sulphur. After decedent's death silver coins, which his wife had given him on the morning of the day he died, had become blackened during the day. It is clearly established by the record that late in the afternoon of July 14, 1940, decedent was engaged in one end of the sulphur building in close proximity to an open window, having the dimensions of eight by eight feet, at the end of the building, and that suddenly he fell backwards and died shortly thereafter. No autopsy was had, and the doctor who attended him during his last few moments of life was not called as a witness. As above noted, the parties stipulated that the death certificate showed decedent's cause of death to be coronary thrombosis. Dr. O'Dell, who had known dece-

dent for approximately twenty years and had treated him in April, 1940, for a cold, testified that until such treatment he had known decedent to be a man of good health, and that on that occasion, which was his last treatment of decedent, he did not find him afflicted with any heart ailment.

The interior of the sulphur building is variantly described in this record, but it may be said that the building contained two rows of vats placed on stands a short distance from the floor; that there were vents along the roof of the building for the purpose of permitting fumes to escape, and that at times the sulphur would spill on the floor of the plant and catch fire, creating a dangerous situation as to sulphur fumes; and on other occasions workmen would clean the vats, at which times decedent and other workmen were wont to leave the building until the air had cleared.

A controlling question in this case, we think, is whether plaintiff has introduced sufficient proof from which a jury may determine that decedent's alleged exposure to sulphur dioxide gas and other noxious gas or fumes resulted in his death. If plaintiff is entitled to prevail on this question, she must do so upon the testimony of Dr. George Grisinger, who, in response to a hypothetical question which sought to have the witness testify whether the inhalation of sulphur fumes and chlorine gas had "any direct or indirect etiological relationship to decedent's death", answered, "From the facts set forth in the hypothetical question, my answer would be that it was due to prolonged exposure, which is, in a sense, a chronic exposure". The question addressed to Dr. Grisinger assumed the following facts: That decedent died on July 14, 1940, at the age of forty-eight at defendant's plant; that he had been employed and worked in defendant's plant for seven months before he died; that he had good health until two and a half or three months prior to his death, when he began to and did experience the symptoms concerning which Mrs. Hayzlett testified; that on July 10, 1940, he had worked from 12:30 to 4:30 o'clock in the afternoon in

the carbon bisulphide plant where there were sulphur fumes; that decedent had to leave his place of work in said plant and get out in the fresh air on several occasions, by reason whereof he spent only about half of his time in the afternoon of that day in the plant. The question further assumed that decedent was subjected to and inhaled sulphur fumes on February 11 and 14, March 6, 7, and 12; May 15; June 21 and 25; July 1, 8 and 9, 1940; that he had worked from February 9 to July 2 at various intervals for a total of one hundred and nine hours in defendant's chlorine plant, where sometimes chlorine gas was present; that decedent's wife detected the odor of sulphur when she laundered decedent's working clothes which she did twice a week for at least two months prior to his death, and further that the witness was required to assume that Dr. O'Dell had known Hayzlett for approximately twenty years, had treated him for a cold in April, 1940, at which time he did not find any heart condition, and that he knew Hayzlett to be a man of good health up until April, 1940, when he last treated him.

The circuit court was of the opinion that the hypothesis contained in the questioned addressed to Dr. Grisinger was erroneous because the record did not disclose that decedent had, in fact, been exposed to chlorine gas, and further that court thought because the question did not state the immediate cause of death it did not contain a sufficient basis for the opinion sought to be elicited by it. In this we think the trial court was entirely correct; but on cross-examination counsel for defendant asked the witness the following question and received the following answer:

"Q. Doctor, if in this particular case of Mr. Hayzlett's, you were informed as I am now informing you and asking you to assume that the medical diagnosis by the doctor who examined him immediately after death was coronary thrombosis, wouldn't you say that his death then had nothing to do with any gases in that plant?

> "A. The answer to that question is most emphatically no, because I can very easily visualize a direct relationship between the inhalation of these gases and the coronary occlusion. I think it is well established that after a long period of inhalation of toxic, irritating gases, that there is a definite change in the viscosity of the blood. That change in blood viscosity might—it might—I don't say emphatically that it would—but I say, it might be the very factor that would bring about a sudden occlusion of that blood vessel, because of the fact that in the increased viscosity of that blood, naturally it would be more difficult for that increased viscosity of the blood or thickened blood—in other words, we might put it—more difficult for it to go through this already narrowed opening which has occluded in the coronary vessel due to the damage that naturally ensues prior to a coronary occlusion, in most cases."

On the basis of this question and answer the circuit court remanded the case for the introduction of the death certificate on the theory that "the jury would have been entitled to find that plaintiff's decedent's inhalation of sulphur dioxide had a direct causal connection with his death by coronary thrombosis." However, assuming that decedent died as the result of coronary thrombosis, is Dr. Grisinger's answer to the question propounded by defendants counsel on cross-examination sufficient to have entitled the jury to find that coronary thrombosis came about as the result of the alleged inhalation of sulphur dioxide gas or sulphur fumes?

In this jurisdiction this Court has heretofore approved the rule that a physician is permitted to give his opinion as to the cause of a diseased condition of the human body. *Barker* v. *Ohio River Railroad Co.*, 51 W. Va. 423, pt. 5 syl., 41 S. E. 148, 152, 90 Am. St. Rep. 808. In that case expert testimony to the effect that the "plaintiff's condition might have been caused by a shock, a fall or anything that produces a shock to the spinal column" was held unobjectionable, and there is specific mention that "By other evidence this condition was connected with the accident."

Without reference to the enunciated rule in the *Barker* case, it was held in *Foose* v. *Hawley Corporation,* 120 W. Va. 334, 198 S. E. 138, that "Respecting a physical injury of which a person is suffering, a physician, grounding his testimony on direct information or a proper hypothetical question, may give in evidence his opinion of the cause of which the injury is the resultant". We quote from the Court's opinion respecting the appraised testimony:

> "Two physicians were witnesses for the plaintiff respecting the *probable* effects of the accident. The first one testified from information gained from a personal examination of the plaintiff and from the history which the latter gave the physician. This witness, in reply to a question whether in his opinion the elevator accident had anything to do with the hernia, answered: *'In my opinion it probably in all probability was the exciting cause of the hernia.'* The other medical witness for the plaintiff had not examined him, but in answer to a hypothetical question wherein were set forth the facts of the accident, and his opinion elicited whether the elevator incident had anything to do with the hernia, said: 'I think that it is quite *possible* that the accident was the cause of the hernia.' And further, on cross-examination, respecting the elevator occurrence, he stated: 'I think that could cause it. *I think it is very probably the cause'* ". (Italics supplied).

We thus observe that the Court correctly characterized such testimony as relating to probable cause as distinguished from possible cause which the word "might", used by Dr. Grisinger, denoted.

We are not concerned with the relevancy of the expert testimony from the standpoint of admissibility, but rather upon the issue of its sufficiency in establishing a causal relationship between decedent's inhalation of gas and his death. We find no guide in the decided cases in this jurisdiction, but in 135 A. L. R. 516, there is found a collation of cases where the rule is stated thus:

> "It appears to be well settled that medical testimony as to the possibility of a causal relation

between a given accident or injury and the subsequent death or impaired physical or mental condition of the person injured *is not sufficient, standing alone, to establish such relation".* (Italics supplied).

See also *Burton* v. *Holden & Martin Lumber Co.,* 12 Vt. 17, 20 Atl. (2d) 99, 135 A. L. R. 512. We think the rule so expressed is sound and consonant with the principle announced in the *Barker* case, *supra.* Hence, it is our conclusion that while the testimony of Dr. Grisinger was properly admissible for consideration by the jury with any other testimony that could have been adduced showing the causal connection between decedent's inhalation of noxious gases and death caused by coronary thrombosis, but since an examination of the record fails to disclose any such circumstances, the opinion of Dr. Grisinger standing alone is not sufficient to have warranted submission of the case to the jury.

Prior to the institution of this action decedent's wife filed and prosecuted a claim as surviving widow before the Workmen's Compensation Commissioner, which claim was denied on the ground that decedent's death did not occur in the course of and as the result of his employment. It is now contended that because Mrs. Hayzlett in that proceeding asserted that her husband's death was the result of a single exposure at defendant's plant on July 10, she may not now in this action be permitted to contend that decedent died from a disease incurred by being gassed over a long period of time. We are cited in support of defendant's contention to *Keller* v. *Railway Co.,* 113 W. Va. 286, 167 S. E. 448; *Ealy* v. *Shetler Ice Cream Co.,* 110 W. Va. 502, 158 S. E. 781; and *MacDonald* v. *Long,* 100 W. Va. 551, 131 S. E. 252, which, in effect, hold that parties will not be permitted to· assume successive inconsistent positions in the course of a suit or series of suits in reference to the same fact or set of facts. We do not think there is merit in such position. Mrs. Hayzlett in her claim before the commissioner appeared as an individual, while in the instant case she sues as

administratrix of decedent's estate. Moreover, the bases for recovery are entirely dissimilar in the two proceedings.

As we have hereinbefore concluded that the causal relationship between the inhalation by decedent of sulphur dioxide gas and his subsequent death was not established by evidence sufficient to submit the case to the jury, we do not deem it necessary to discuss the evidence bearing on the question of negligence.

We reverse the judgment of the circuit court in remanding this case to the court of common pleas for further development, and enter judgment here on the jury verdict.

*Judgment reversed, order entered here.*