NOBLESVILLE CASTING DIVISION OF TRW, INC., Appellant
(Defendant below),

v.

Freddie J. PRINCE, Appellee
(Plaintiff below).

No. 882S297.

Supreme Court of Indiana.

Aug. 11, 1982.

Paul J. Fields, Lowe, Gray, Steele & Hoffman, Edwin J. Bunny, Indianapolis, for appellant.

Arvin R. Foland, Noblesville, for appellee.

Edgar W. Bayliff, Bayliff, Harrigan, Cord, Maugans & Russell, P. C., Kokomo, for Indiana Trial Lawyers Ass'n as amicus curiae.

HUNTER, Justice.

This cause is before us on the petition to transfer of Freddie J. Prince, wherein he seeks review of the Court of Appeals' decision found at *Noblesville Casting, Div. of TRW, Inc. v. Prince*, (1981) Ind.App., 424 N.E.2d 1055. There, the Court of Appeals reversed the Full Industrial Board's award of workmen's compensation benefits to Prince. We hereby grant transfer, reverse and vacate the Court of Appeals' decision, and reinstate the award rendered by the Industrial Board.[1]

Prince was employed as a maintenance man at Noblesville Casting. His duties consisted of general repair work throughout the plant.

On May 6, 1976, Prince and two fellow employees were assigned the project of repairing a flat car line which transported heavy flasks. Each flask, when empty, weighed two to three hundred pounds. Together, the three men were lifting the flasks and placing them on the line; as they attempted to lift one of the flasks which was filled with a casting and sand, the bulk of the weight shifted toward Prince. He experienced immediate pain in his back, groin, and left leg, and had difficulty straightening his back. The incident was reported to Prince's superiors; Prince left work for the remainder of the day.

A doctor examined Prince but found no evidence of a hernia. Thereafter, Prince resumed work but continued to experience intense and periodic pain in his back, as well as in his left leg. At times the pain prevented him from working.

On October 18, 1977, he entered the hospital for back surgery. A spinal fusion, which was designed to restrict motion and thereby alleviate pain, was performed on November 8, 1977.

1. Oral argument was held on Prince's petition to transfer on April 19, 1982. The proceedings were recorded and have been considered together with the briefs filed in the cause.

Following the operation, Prince was unable to return to work until July 12, 1979. Dr. William Norman, who performed the spinal fusion, stated that Prince had sustained fifteen percent impairment of the man as a whole as a result of the restriction in movement worked by the surgery. That impairment was additional to the existing thirty-five percent impairment Prince had sustained via two prior back operations in the late 1960s, when disks were removed.

Prince subsequently filed a claim for workmen's compensation; therein, he sought recovery for expenses incurred for medical care and hospital services and supplies, as well as compensation for his disability and impairment.

Pursuant to Ind. Code § 22–3–4–6 (Burns 1974), a hearing was held before a single Hearing Member of the Industrial Board. Based on the stipulations of the parties and the evidence presented, the Hearing Member ordered Noblesville Casting to pay $6,607.71 to Prince for his medical expenses; in addition, Prince was awarded $90 per week for the thirty-eight week period of temporary total disability defendant sustained subsequent to his operation, and $60 per week for a period of seventy-five weeks as compensation for his post-operative impairment.

Noblesville Casting then exercised its statutory right to seek review of the award by the Full Industrial Board. *See* Ind. Code § 22–3–4–7 (Burns 1974). Following a hearing on the matter, the Full Industrial Board affirmed the award as entered by the hearing officer.

Noblesville Casting then sought judicial review of the Full Board's decision. Ind. Code § 22–3–4–8 (Burns 1974). Among the arguments presented to the Court of Appeals by Noblesville Casting were the concomitant contentions that inasmuch as the expert testimony regarding proximate cause had not established to *a reasonable medical certainty* a causative link between the accident and Prince's back problems, the expert testimony was inadmissible and, in turn, the evidence insufficient to sustain the award. The Court of Appeals, relying on this Court's decision in *Palace Bar, Inc. v. Fearnot,* (1978) 269 Ind. 405, 381 N.E.2d 858, agreed with Noblesville Casting, and so reversed the award entered by the Full Industrial Board.

In *Palace Bar, Inc. v. Fearnot, supra,* this Court stated:

"The probative value of the testimony of an expert witness is such witness' opinion as an expert based on facts and circumstances given to him or shown to him subsequent to the occurrence of the event. A doctor's testimony can only be considered evidence when he states that the conclusion he gives is based on reasonable medical certainty that a fact is true or untrue. A doctor's testimony that a certain thing is *possible* is no evidence at all. His opinion as to what is possible is no more valid than the jury's own speculation as to what is or is not possible. Almost anything is possible, and it is thus improper to allow a jury to consider and base a verdict upon a 'possible' cause of death." 269 Ind. at 415, 381 N.E.2d at 864 (emphasis original).

As the Court of Appeals observed, the expert testimony regarding the causative link between the accident and Prince's condition was characterized in terms of medical possibilities rather than reasonable certainties.

Dr. Norman was the sole expert witness to testify on the issue of causation; his testimony reads in pertinent part:

Q. "Well, from the physical examination and from what you observed during the operation, the kind of repair that you did make, what are the causes of such an injury or that would require this kind of repair?"

A. "Well, I think, basically, we do know that this man had previous trouble. He had previous disk trouble. He had subsequent changes as a result of that; namely, that of narrowing of the disk and what we call degenerative or arthritic changes.

"Of course, during this period he had evidence of sciatica nerve-root irritation from the changes that occurred in this area.

"We see it at times when patients have had an injury superimposed upon these conditions which seems to aggravate or increase their ability and symptoms."

Q. "Certain external trauma could cause the sort of thing for which you operated on him?"

A. "Well, *it could be*—Let me say it this way:

"*It could be* an aggravating factor in producing more irritation or symptoms in this area."

Q. "Now, I would like for you to assume for a moment a few facts.

"If you would assume that Mr. Prince, back about May, 1977, [sic] was lifting a heavy object—A flask—at his employment and that in so doing as he was stooped over, the weight shifted to him and at that particular time he experienced pain down into his legs, down into his groin and, then, taking into consideration the history that you did take before the operation and what you have seen from your personal observations during the operation and thereafter; what, if any opinion, do you have with a degree of medical certainty as to the relationship between the lifting of the flask and necessity for the spinal surgery?"

[objection to hypothetical, overruled by Board]

A. "We know *it is possible with the type of history you have given me*, to reinjure his back, and we would in most cases, unless some evidence of fracture or dislocation or something of that nature, we would have to consider it as a strain or injury super-imposed upon a preexisting condition or an aggravation as I stated."

Q. "Now, as I understand the history that you took, you are acquainted with two prior laminectomys [sic]?"

A. "Yes. Disc surgeries."

Q. "The history that you have given, taking into consideration those things and the history that you took from the patient before the operation and assuming that on or about May the 6th, 1977, [year amended to 1976] while at his employment at Noblesville Casting Company, Mr. Prince, while stooping over to lift up a flask that had fallen from its little flatcar, while being assisted by two other individuals and that flask—Weighing 2-to-300 lbs and being in a stooped-over position—at that time the weight shifting on him and experiencing sharp pain in his legs and low back and into his groin, assuming what you observed in the X-rays, the things today about which you have testified, what is your opinion as to the relationship of such experience of pain and injury and the necessity for the spinal fusion that you performed?"

[objection to hypothetical, overruled by Board]

A. "I would have to say that with that type of history, *it is possible* to produce enough additional trouble and aggravation to require subsequent treatment as we have described." (Emphasis added.)

Dr. Norman's reliance on the word "possible" and use of the phrase "could be" bring his testimony within the sphere of our above-quoted statement in *Palace Bar*, as Prince concedes.

■ Alternatively, however, he argues two propositions. He maintains that either a literal application should not be applied to our language in Palace Bar, or that our opinion therein should be modified, clarified, or overruled. Likewise, our response is twofold. We here reject the notion that the admissibility and probative value of medical testimony is dependent upon the expert witness's ability to state conclusions in terms of "reasonable medical certainty"; lacking a clear majority here, our specific language in *Palace Bar* to the contrary should nonetheless be overruled.

■ Our decision rests on fundamental premises of our rules regarding opinion testimony by expert witnesses. First, it is well settled that an expert witness is not permitted to give an opinion where the jurors are as well qualified to form an opinion based on the facts presented. *Green v. State*, (1981) Ind., 422 N.E.2d 1190;

*Reburn v. State*, (1981) Ind., 421 N.E.2d 604. The converse circumstances, of course, provide the *raison d'etre* for expert witnesses. When the subject of the opinion is a matter unrelated to the experience and knowledge of the average juror, such as scientific, medical, or professional matters, the expert witness may be permitted to give an opinion, for the testimony facilitates the finder of fact's understanding of the evidence and the ultimate facts in issue. *Id.; Reid v. State*, (1978) 267 Ind. 555, 372 N.E.2d 1149; *State v. Vaughan*, (1962) 243 Ind. 221, 184 N.E.2d 143; *see also*, M. Seidman, THE LAW OF EVIDENCE IN INDIANA p. 21 (1977).

In addition, given a subject matter appropriate for expert testimony, the opinion must be preceded by a foundation of evidence establishing the witness's credentials as an expert and the reliability of any scientific methods utilized by the witness to reach the opinion. *Jones v. State*, (1981) Ind., 425 N.E.2d 128; *Reid v. State, supra; Zupp v. State*, (1972) 258 Ind. 625, 283 N.E.2d 540. The requirements insure that the witness does in fact have greater knowledge and understanding than the average juror, and that any scientific methods employed are reliable.

Once the foundation has been established, the question remains whether an expert witness should be permitted to give an opinion or conclusion absent a requisite degree of certainty in the opinion or conclusion. In turn, if a degree of certitude is required, a companion question is presented: what degree of certitude—as defined in testimonial terms such as "possibly," "could have been," "educated guess," "probably," "more likely than not," "reasonable scientific certainty," "to a demonstrable certainty," or "inevitably"—should be demanded?

It is readily apparent that an attempt to quantify degrees of certitude in terms such as those employed by witnesses does, to some extent, inject semantics into the matter of expert opinion testimony. The various phrases and words do not, in and of themselves, connote exact degrees of certainty or conclusiveness; usage of any particular term by an expert witness, as a consequence, may turn on the manner in which a question is propounded or the witness's subjective assessment of the meaning of the phrase or word used to express the opinion. *See, e.g., State v. Austin*, (1976) 52 Ohio App.2d 59, 368 N.E.2d 59 (expert testified that he regarded "reasonable medical certainty" as up in the "ninety-nine point nine nine percentage range").

At the same time, to hinge the question whether an expert's opinion is admissible and probative on the willingness and ability to say that such-and-such is "reasonably certain," as opposed to "probable" or "possible," is to impose on the expert a question which elevates the law's demand for certainty in language over the state of the particular art and the value of the advances made therein. Medicine, for instance, is not yet an exact science; to demand reasonable certainty in medical opinions places a sometimes insurmountable barrier in the face of the candid and straightforward medical expert. New York's highest court explained:

"Finally, we turn to Dr. Mayer. Dr. Mayer was honest enough to say that, while he had an opinion that the tuberculosis pre-existed the accident, there was no proof of it. As to traumatic aggravation of the tuberculosis his report said that 'it may be assumed with all reasonable likelihood that [it] could possibly have influenced adversely his tuberculosis.' Of course, one can pick out the words 'assumed' and 'possibly'. But this careful physician was saying all that an opinion expert could honestly say, that is that although there could not be certainty in such a case his professional judgment was that causality should and could be assumed and acted upon although in the nature of things it could never be scientifically proven or disproven.

"Our function is not to reject opinion evidence because nonlawyer witnesses fail to use the words preferred by lawyers and Judges but to determine whether the whole record exhibits, as it does here, substantial evidence of aggravation ...." *Ernst v. Boggs Lake Estates*, (1963) 12 N.Y.2d 414, 416, 240 N.Y.S.2d 153, 154, 190 N.E.2d 528, 529.

These thoughts were echoed by the Supreme Court of Michigan in its recent decision in *Kostamo v. Marquette Iron Co.*, (1979) 405 Mich. 105, 274 N.W.2d 411, where medical causation testimony had been tendered in terms of "could have," "might have," or "possibly":

"In the present state of medical knowledge, we know that stress can cause a heart attack, and that persons who have arteriosclerosis are more likely to suffer heart attacks as a result of stress than those who do not. The stresses that may cause attacks include anxiety, anger, fear, exhilaration, fatigue, and the environment (air, heat, cold).

"We know also that it is not possible to determine medically whether particular stress caused a particular injury. Nevertheless compensation may be awarded based on an assessment of the probabilities in light of the background factual circumstances and any opinion testimony. Opinions tentatively expressed may not on that account be discounted. The certainty, or puffery, with which experts express their opinions may mask differing understandings of the factual background and views regarding causation. The answer is to be found in careful scrutiny of the factual background and not in terminology and emphasis." *Id.*, 405 Mich. at 119–20, 274 N.W.2d at 417.

\*   \*   \*   \*   \*   \*

"Dr. English, Kostamo's medical expert, stated that Kostamo's work 'could have,' 'might have,' 'possibly' precipitated or aggravated Kostamo's heart attack. Dr. Rosenbaum, defendant's expert, stated positively that Kostamo's work 'did not play a role in the production of his attack, nor in his subsequent death \* \* \*.'

"In reviewing this testimony the WCAB [Workmen's Compensation Appeal Board] apparently placed critical importance on the comparative certainty with which the doctors expressed themselves.

"Dr. English's failure to state a medical opinion with certainty reflects the current status of scientific knowledge, not a lack of merit in the claimant's position.

'The matter does not turn on the use of a particular form of words by the physicians in giving their testimony.' *Sentilles, supra*, 361 U.S. p. 109, 80 S.Ct. p. 175. The law does not place on claimants the impossible burden of proving with certainty that work-related stress contributed to their cardiac disorder." *Id.*, 405 Mich. at 136–37, 274 N.W.2d at 425 (footnotes omitted).

\*   \*   \*   \*   \*   \*

"Because of the differing terminology of doctors and lawyers, conclusory statements concerning causation should be rejected by the WCAB, and their uncritical adoption, without examination or relation of the facts to the conclusion, should be rejected by the appellate courts." *Id.*, 405 Mich. at 138, 274 N.W.2d at 426.

Consistent with *Kostamo* and *Ernst*, numerous jurisdictions, including the United States Supreme Court, have rejected the notion that the admissibility and probative value of expert testimony turns on the particular form of words and degree of certainty in which it is expressed. *See, e.g., Sentilles v. Inter-Caribbean Shipping Corp.*, (1959) 361 U.S. 107, 109, 80 S.Ct. 173, 175, 4 L.Ed.2d 142, 144 ("The matter does not turn on the use of a particular form of words by the physicians in giving their testimony"); *United States v. Cyphers* (7th Cir. 1977) 553 F.2d 1064 (rejecting requirement that an expert's opinion testimony be stated in terms of "reasonable scientific certainty"); *State v. Edgin*, (1974) 110 Ariz. 416, 520 P.2d 288 (expert testimony not inadmissible merely because it tends to establish a possibility rather than a probability); *Graham v. Clark*, (1966) 114 Ga.App. 825, 152 S.E.2d 789 (an expert's opinion should not be rejected merely because it is characterized as an "educated guess"); *Bachran v. Morishige*, (1970) 52 Hawaii 61, 67, 469 P.2d 808, 812 ("... there is no necessity that an expert witness' testimony be limited or restricted by labels such as 'certainty,' 'reasonable medical certainty,' 'probability,' 'possibility,' etc."); *Dickinson v. Mailliard*, (Iowa 1970) 175 N.W.2d 588 (expert opinion need not be couched in definite, positive, or

unequivocal terms); *accord* 7 WIGMORE ON EVIDENCE § 1976 p. 186 (Chadbourn Rev. 1978) ("This attempt to control the course of expert testimony is of course unreasonable in itself"); Rose, *A Pragmatic Approach to Medical Evidence and the Lawsuit*, 5 TOLEDO L.REV. 237 (1974) ("certainty generally is illusion," quoting Holmes and debunking notion that a standard of reasonable certainty should be imposed on medical experts' opinions).

As recognized in *Kostamo*, as heretofore quoted, technical scientific or medical matters such as cause-and-effect, under the state of the particular art, may be reduced to a matter of several possibilities. As the Michigan Supreme Court explained, it is known that stress can cause heart attacks, that the effects of stress are exacerbated by arteriosclerosis and the opportunity for a heart attack increased thereby, and that stress may be the product of anxiety, fear, exhilaration, fatigue, and environmental conditions. *Kostamo v. Marquette Iron Co., supra.* It cannot, of course, be said that the average juror is knowledgeable about these factors to the extent of conclusively evaluating their import in the context of particular factual circumstances. Their ability to assess the evidence is facilitated by the knowledge and experience of an expert, whose opinion that any of several possibilities may have caused the effect, provides needed perspective to the less informed jurors. The expert testimony consequently is admissible, for it is relevant to the inquiry in that it tends to prove a material fact. *Jones v. State*, (1981) Ind., 425 N.E.2d 128; *Lock v. State*, (1980) Ind., 403 N.E.2d 1360.

What must be "reasonably certain," it has been recognized, is that the witness is in fact an expert and that the analytical and scientific methods employed are generally accepted in the particular community of expertise; in other words, "reasonable certainty" is primarily a formulation designed to guarantee the trustworthiness or reliability of the opinion offered, rather than the fact to be proved. *Boose v. Digate*, (1969) 107 Ill.App. 418, 246 N.E.2d 50; *State v. Wind*, (1973) 60 Wis.2d 267, 208 N.W.2d 357.

Once the foundational requirements have been satisfied and the opinion elicited, the expert witness is subject to the hallmark of our adversarial system—cross-examination. The strengths and weaknesses of the expert's opinion may be questioned against the facts, its conclusiveness or lack thereof may be explored, and any lack of certitude may be fully revealed to the finder of fact.

■ Thereafter, as is virtually the unanimous rule in this nation's jurisdictions, the jury is free either to accept or reject the opinion of the expert witness; the finder of fact may supplant its own conclusion for that of the expert. *White v. Crow*, (1964) 245 Ind. 276, 198 N.E.2d 222; *City of South Bend v. Users of Sewage Disposal*, (1980) Ind.App., 402 N.E.2d 1267. The finder of fact is entitled to weigh and determine the credibility to be accorded the expert's opinion based on the evidence presented, including the extent of the witness's experience and expertise, the reliability of the analytical methods employed, and the degree of certitude with which the opinion is cast. *State v. Vaughan*, (1962) 243 Ind. 221, 184 N.E.2d 143; *Kranda v. Houser-Norborg Medical Corp.*, (1981) Ind.App., 419 N.E.2d 1024.

This analysis, with its inherent capacity to accommodate both the role of the fact-finder and that of the expert witness, has also prompted the widespread refusal to require that expert opinions be couched in terms of reasonable scientific or medical certainty. *See, e.g., Sentilles v. Inter-Caribbean Shipping Corp., supra* [U.S.]; *Taenzler v. Burlington Northern*, (8th Cir. 1979) 608 F.2d 796; *State v. Edgin, supra* [Ariz.]; *Graham v. Clark, supra* [Ga.App.]; *Bachran v. Morishige, supra* [Hawaii]; *Dickinson v. Mailliard, supra* [Iowa]; *Twombley v. Fuller Brush Co.*, (1960) 221 Md. 476, 158 A.2d 110; *State v. Mitchell*, (Maine 1978) 390 A.2d 495; *Kostamo v. Marquette Iron Co., supra* [Mich.]; *Carpenter v. Nelson*, (1960) 257 Minn. 424, 101 N.W.2d 918; *State v. Vargus*, (1977) 118 R.I. 113, 373 A.2d 150; *Pygman v. Helton*, (1964) 148 W.Va. 281, 134 S.E.2d 717; *State v. Wind, supra* [Wis.].

This jurisdiction has not deviated from the foregoing principles, nor has it ignored the considerations heretofore discussed. Our case law reflects adherence to the proposition that however conclusively any expert's opinion might be stated, the ultimate concern and prerequisite to admissibility is the reliability of the analytical methods or techniques upon which the conclusion or opinion is based. Where the foundational requirement has not been satisfied, the expert testimony has been precluded. *See, e.g., Zupp v. State,* (1972) 258 Ind. 625, 283 N.E.2d 540 (polygraph examination process inherently unreliable). Where the reliability of the analytical methods employed has been established, the testimony has been permitted. *See, e.g., Jones v. State, supra* (neutron activation analysis deemed reliable and expert opinion admitted); *Reid v. State, supra* (trace metal detection analysis held sufficiently reliable to permit expert testimony and opinion); *Beck v. Beck,* (1973) 159 Ind.App. 20, 304 N.E.2d 541 (major blood group testing deemed reliable to establish non-paternity and results thereof were admitted).

Likewise, our appellate courts have emphasized the importance of the foundational requirement that the witness's expertise be established. *Jones v. State, supra; Eskridge v. State,* (1972) 258 Ind. 363, 281 N.E.2d 490; *Klebs v. State,* (1974) 159 Ind. App. 180, 305 N.E.2d 781; *McCraney v. Kuechenberg,* (1969) 144 Ind.App. 629, 248 N.E.2d 171. Given the general reliability of the analytical method employed, this Court has explained that the degree of expertise and experience attained by the witness is a matter which may bolster or diminish the weight to be accorded the expert's testimony and conclusions:

"The persuasiveness of evidence produced by such a test is, in a large measure, dependent upon the expertise of the witness who conducted it, which in the final analysis is to be determined by the jury, only after an opportunity of careful cross examination." *Reid v. State, supra,* 267 Ind. at 560, 372 N.E.2d at 1152.

Typical of our approach is our application of these principles in *Jones v. State, supra.* There, the state, over defendant's objection, had introduced opinion testimony of an FBI agent who had conducted neutron activation analysis testing on bullets taken from the victim, as well as bullets found in defendant's coat pocket. Based on his comparative analysis of the chemical composition of the bullets, the witness stated that it was his opinion that the various bullets "could have come" from the same box of ammunition.

In ruling that the testimony was admissible, this Court focused our rationale on the fact that the foundation elements for the testimony had been established:

"Agent Riley testified that he has conducted thousands of neutron activation analysis tests in the past twelve years and that he has testified as an expert witness on the subject approximately 150 times in both state and federal courts. He testified that neutron activation analysis is conducted by placing material in the core of a nuclear reacter. When radioactive, the material emits gamma rays which are analyzed to determine the amounts of trace elements present in the material. Riley testified that universities and government agencies throughout the world use the technique on a daily basis to perform elemental composition analysis and that it is a scientifically valid technique and is accepted worldwide.

\*    \*    \*    \*    \*    \*

"No Indiana case authority concerning the admissibility of neutron activation analysis has been found. However, there are cases from other jurisdictions admitting such evidence. *See: U.S. v. Stifel,* (6th Cir. 1970) 433 F.2d 431, *cert. denied* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531; *State v. Jackson,* (1978) Mo.App., 566 S.W.2d 227; *State v. Duncan,* (1976) Mo.App., 540 S.W.2d 130. The neutron activation analysis has been generally recognized as reliable." *Jones v. State, supra,* 425 N.E.2d at 130–1.

Given this foundation, the testimony was deemed proper, notwithstanding the fact

that the expert was able to state only that the bullets "could have come" from the same box of ammunition. The lack of conclusiveness was merely a matter which concerned the weight of the testimony, which was relevant in that it assisted the jury's ability to intelligently resolve a material factual question:

"As was noted with regard to trace metal detection technique, the persuasiveness of evidence produced by such a test is, in large measure, dependent upon the expertise of the witness who conducted it, which in the final analysis is to be determined by the jury, only after an opportunity of careful cross examination. *Reid v. State*, (1978) 267 Ind. 555, 372 N.E.2d 1149, 1152. There was no error in allowing this testimony.

"Appellant further argues that the evidence presented was without sufficient relevance and is without merit. Clearly the results of the test increased the likelihood that the bullets found in the defendant's pocket were from the same box as the bullet removed from the victim. The law in Indiana with respect to relevancy is that evidence is relevant if it has a tendency to prove a material fact. *Lock v. State*, (1980) Ind., 403 N.E.2d 1360, 1367. There is no error on this issue." *Id.* 425 N.E.2d at 131.

*Accord, Herman v. Ferrell*, (1971) 150 Ind. App. 384, 276 N.E.2d 858; *Magazine v. Shull*, (1945) 116 Ind.App. 79, 60 N.E.2d 611.

■ Consistent with *Jones*, as well as the other case authority, principles, and considerations discussed herein, we reiterate that no threshold level of certainty or conclusiveness is required in an expert's opinion as a prerequisite to its admissibility. Assuming the subject matter is one which is appropriate for expert testimony and that a proper foundation has been laid, the expert's opinion or conclusion that, in the context of the facts before the witness, a particular proposition is "possible," "could have been," "probable," or "reasonably certain" all serve to assist the finder of fact in intelligently resolving the material factual questions. The degree of certainty in which an opinion or conclusion is expressed concerns the weight to be accorded the testimony, which is a matter for the jury to resolve.

■ Notwithstanding the probative value and admissibility of an expert's opinion which falls short of "reasonable scientific or medical certainty," we also reiterate that standing alone, an opinion which lacks reasonable certainty or probability is not sufficient evidence by itself to support a verdict. Indeed, that was the focus of *Palace Bar, Inc. v. Fearnot, supra*; the rule is well established in this jurisdiction, as well as in others. *See, e.g., Dayton Walther Corp. v. Caldwell*, (1980) Ind., 402 N.E.2d 1252; *Herman v. Ferrell, supra; Beaman v. Hedrick*, (1970) 146 Ind.App. 404, 255 N.E.2d 828; *Magazine v. Shull, supra; see also, Boose v. Digate, supra* [Ill.]; *Carpenter v. Nelson, supra* [Minn.]; *Hayzlett v. Westraco Chlorine Products Corp.*, (1943) 125 W.Va. 611, 25 S.E.2d 759.

The rule is simply a counterpart to the standard and burden of proof; it reflects respect for such concomitant propositions that civil liability or an award of damages may not be predicated purely on speculation (*G. B. v. S. J. H.*, [1975] 167 Ind.App. 175, 338 N.E.2d 315) or that criminal liability should not attach where purely circumstantial evidence points to conflicting inferences of guilt and innocence. *Spears v. State*, (1980) Ind., 401 N.E.2d 331.

■ Of course, an expert's opinion that something is "possible" or "could have been" may be sufficient to sustain a verdict or award when it has been rendered in conjunction with other evidence concerning the material factual question to be proved. *Dayton-Walther Corp. v. Caldwell, supra; Herman v. Ferrell, supra*. No hard and fast rule can be stated; the matter is a factual one to be resolved on a case-by-case basis, depending upon the particular standards of proof or review which are applicable, as well as the evidence presented, including the expertise of the witness and the data and analytical methods upon which the opinion is based. *Jones v. State, supra; Gradison v. State*, (1973) 260 Ind. 688, 300 N.E.2d 67; *Herman v. Ferrell, supra*.

In the case before us, Dr. Norman's testimony that Prince's medical problems were possibly linked to the May 6, 1976 incident was of probative value and was properly admitted; as we recently recognized in *Rork v. Szabo Foods*, (1982) Ind., 436 N.E.2d 64, "the question of the causal connection between a permanent condition, a work-related injury, and a pre-existing affliction or condition is a complicated medical question .... " *Id.* at 70. Norman's opinion could only serve to assist the finder of fact in intelligently resolving that question.

Noblesville Casting, however, also has argued that the evidence was insufficient to support the Board's finding that Prince's injury was the result of the strain imposed upon a pre-existing condition; it argues that the finding is the product of mere conjecture and speculation.

Its contention is predicated in part upon its argument heretofore rejected that Dr. Norman's testimony had no probative value because it was expressed in terms other than "reasonable medical certainty." While the opinion of Dr. Norman was expressed only in terms of possibilities, it was supported by other evidence regarding the causal link between the work-related accident and the aggravation of his back problems.

■ Our analysis must proceed from the threshold appellate perspective that it is not this Court's prerogative to weigh the evidence or judge the credibility of witnesses. In our review of the Board's findings and conclusions, we may consider only that evidence which tends to support its determination, together with uncontradicted adverse evidence. Only when the evidence leads inalterably to a conclusion contrary to that reached by the Board will its decision be disturbed. *Talas v. Correct Piping Co.*, (1982) Ind., 435 N.E.2d 22; *White v. Woolery Stone Co., Inc.*, (1979) Ind.App., 396 N.E.2d 137.

The record reveals that in addition to Dr. Norman's testimony, Prince immediately suffered pain in his back, groin, and left leg after the flask, which weighed at least three hundred pounds, shifted to Prince's side. Both Curtis Wyatt and Leonard Logan, who witnessed the accident, testified that once the flask had been set down, Prince was holding his back and could not straighten his posture to a vertical position. Gerald Mantz, who accompanied Prince to the foreman to report the incident, stated that Prince walked bent over at a forty-five degree angle.

■ After May 6, 1976, Prince oftentimes indicated to foreman Garvin Sexton that his "back was killing him." Prince testified that the back pain slowly worsened; some Saturdays he was unable to work because of the pain. He consulted his family doctor who referred him to Dr. Norman, an orthopedic surgeon licensed to practice in Indiana. Acting on behalf of Norman, Dr. Sam Davis, also an orthopedic surgeon, examined Prince and took the medical history of his past and present back problems. This history, together with Dr. Norman's knowledge of orthopedics, his examination of Prince's back, and his knowledge of the May 6, 1976 accident, formed the basis for his opinion. When coupled with the lay and medical testimony regarding the extent of Prince's back problems both before and subsequent to the accident, we cannot say the evidence leads inalterably to a conclusion contrary to that reached by the Full Industrial Board; the evidence was sufficient to support the Board's determination that Prince's back problems were the result of the imposition of strain upon a pre-existing condition. *Compare, Herman v. Ferrell, supra; Beaman v. Hedrick, supra; Kaiser Alum. Chem. Corp., Foil Kraft Div. v. Schalton*, (1965) 136 Ind.App. 636, 204 N.E.2d 225.

Inasmuch as the Court of Appeals reversed the Board's determination on the basis discussed above, it did not address other issues raised by Noblesville Casting. Pursuant to Ind.R.Ap.P. 11(B)(3), we turn to those contentions:

1. Whether the Industrial Board erred by failing to make adequately specific findings of basic fact;

2. Whether the evidence is sufficient to support the Board's findings; and

3. Whether the Board erred in permitting Prince to introduce particular evidence.

## I.

■ Noblesville Casting maintains the Full Industrial Board failed to make adequately specific findings of basic fact. The Board's findings read:

"[H]aving heard the stipulations by the parties of the facts in said cause, all of the evidence adduced, and having reviewed the entire record and being duly advised in the premises therein, [the Board] now adopts the stipulations and further finds:

"1. Plaintiff's normal duties consisted of general maintenance throughout the plant. On May 6, 1976, Plaintiff was assigned to Department # 71, for the purpose of restoring to operation the flat car line upon which heavy flasks set.

"2. While in the process of replacing a flask weighing 200–300 pounds, Plaintiff suffered a severe strain. This strain was brought about by weight being shifted onto Plaintiff while he was on the north side of a flat car, while two fellow employees went to the south side of the car to render assistance to the Plaintiff. The two fellow employees lifted their side of the flask, and when they did this, all the weight shifted to Plaintiff, placing a severe strain upon him. This was the proximate cause of severe pain to his back, groin, and lower extremeties. Plaintiff was observed by fellow employees placing his hands on his back and heard by them to state he had pain.

"3. That after the pain came on, Plaintiff was unable to straighten up. Plaintiff went to the Department # 71 and *reported the incident* and was told to report to the office. Plaintiff did so and was sent to the company doctor.

"4. That Plaintiff had no difficulty in performing his job during the year prior to May 6, 1976, but that he was impeded in his performance after May 6, 1976. Plaintiff suffered from pain in his back after May 6, 1976 and complained to his superiors of his discomfort during the duration from May 6, 1976 to October 18, 1977.

"5. Plaintiff continued to work, but as time passed, he became more impaired until on October 18, 1977, while at work, he could not continue.

"6. That the pain Plaintiff originally experienced in his groin, left in a few days after May 6, 1976, but the back and leg pain never left, but rather intensified. This increased impairment resulted in a decrease in the number of hours Plaintiff was able to work from May 6, 1976 to October 18, 1977. The impairment was as a result of stiffness, strain and pain.

"7. Plaintiff reported the injury of May 6, 1976, to his employer's insurance adjuster on October 19, 1977, and then described the on-setting of the disability to Dr. Sam J. Davis and also advised Dr. William Norman of the injury as well.

"8. Dr. William H. Norman was Plaintiff's surgeon and is the treating physician in whose care Plaintiff remains to the present. Dr. Norman has been acquainted with Plaintiff as a patient since 1963.

"9. That the surgery performed was for the purpose of restricting motion and relieving pain. That the injury and surgery will result in additional immobilization, as its purpose is to restrict motion of the back for relief of pain.

"10. That on April 4, 1979, Plaintiff had a 30% voluntary limitation of motion of his back.

"11. That as a result of the injury suffered by the Plaintiff, during the course of his employment on May 6, 1976, Plaintiff has suffered additional permanent impairment of 15% to the man as a whole.

"12. That Plaintiff was totally disabled as a result of the injury on May 6, 1976 from October 18, 1977 until July 12, 1978.

"13. That Plaintiff's injury was as a result (proximate cause) of a strain being imposed upon a pre-existing condition, i.e., the aggravation thereof.

"14. Judical [sic] notice is taken and Defendant's proposed findings filed June 21, 1979, show that Plaintiff had a pre-

existing condition of a weakened back, due to two work-related prior disc surgeries, which resulted in Plaintiff being rated 20% permanent partial impairment of the man as a whole in 1966, and an additional 15% in 1969.

"15. The strain suffered on May 6, 1976, aggravated that condition resulting in (proximate cause) the necessity of a spinal fusion and the additional permanent impairment of 15% to the man as a whole over the impairment existing on May 6, 1976.

"16. That Plaintiff's impairment has reached a permanent state.

"17. That Defendant had actual notice of the May 6, 1976 accident, and provided certain statutory medical treatment by sending Plaintiff to the company doctor and filling out insurance forms.

"18. That Plaintiff has incurred $6,607.71 in medical expenses as a result of the injury.

"19. That Plaintiff has not been paid any compensation for medical expenses, temporary total disability or permanent partial impairment.

"20. That counsel for the Plaintiff has expended at least forty (40) hours of work on this case and that he bills at the reasonable rate of $45.00 per hour."

Noblesville Casting asserts the findings are insufficient in three respects.

First, it is argued the Board failed to make a finding regarding a material element of Prince's claim. Relying on *Noble County Highway Dept. v. Sorgenfrei*, (1975) 163 Ind.App. 81, 321 N.E.2d 766, as well as cases cited therein, Noblesville Casting asserts that "A necessary element to recover Workmen's Compensation for aggravation of a pre-existing condition or disease is that the condition is materially aggravated or accelerated by the injury, resulting in disability or death earlier than would have otherwise occurred." *See also, Heflin v. Red Front Cash and Carry Stores*, (1947) 225 Ind. 517, 75 N.E.2d 662. The rule as defined was adopted by this Court in *Heflin*:

"Indiana long ago adopted the majority rule, that where an employee afflicted with disease receives a personal injury under such circumstances that he might have obtained compensation under a Workmen's Compensation Act on account of the injury had there been no disease involved, but the disease is materially aggravated or accelerated by the injury, resulting in disability or death earlier than would otherwise have occurred, and the disability or death does not result from the disease alone progressing naturally as it would have done under ordinary conditions, but the injury, aggravating and accelerating its progress, materially contributes to hasten its culmination in disability or death, there may be an award under the Workmen's Compensation Act." *Id.*, 225 Ind. at 521–2, 75 N.E.2d at 664.

The effects of a condition which is degenerative in nature, such as the leukemia present in *Sorgenfrei*, may be "accelerated" or "hastened" by a work-related accident; the "aggravation" of a condition, on the other hand, occurs when the effects of a condition which are otherwise quiescent or settled, are exacerbated. In other instances, a degenerative condition may exist alongside a settled one; that is the case here, where Prince's pre-existing condition included both a weakened back from surgery and arthritis.

The adequacy of the findings regarding cause-and-effect in the latter circumstance does not turn upon whether causation is characterized in terms of an "aggravation" or "acceleration." Ind.Code § 22–3–3–12 (Burns 1974), wherein the rule is codified requires the Board to determine the extent of disability or impairment which existed prior to the accident by virtue of the pre-existing injury or physical condition. In turn, the Board must determine "the extent of the aggravation or increase resulting from the subsequent permanent injury," and award compensation only for that part of the injury or physical condition which is attributable to the "subsequent permanent injury." *Id.; Rork v. Szabo Foods, Inc., supra; Anton v. Anton Interiors, Inc.*, (1977) 173 Ind.App. 419, 363 N.E.2d 1286.

In finding number 14, the Board adopted Noblesville Casting's own statement that prior to the work-related accident, Prince had sustained thirty-five percent impairment as a result of the disk surgeries. The Board also found that as a result of the injury and spinal fusion, Prince had sustained an additional fifteen percent impairment. The Board found that the injury was caused by the "strain being imposed upon a pre-existing condition, i.e., the aggravation thereof"; the Board also detailed the evidence upon which its conclusion was based.

These findings conform to the requirements of Ind.Code § 22–3–3–12, *supra*, and reveal the Board's "determination of the various relevant sub-issues and factual disputes" before it, as is the central purpose of the fact-finding requirement. *Perez v. United States Steel Corporation*, (1981) Ind., 426 N.E.2d 29, 33. Noblesville Casting's argument is without merit; the findings of basic fact adequately specified the Board's determination of the apportionment issue. *Compare, Rork v. Szabo Foods, supra*.

It is also argued that the findings were inadequate insofar as the Board failed to make any specific finding as to the "nature" of the pre-existing back condition. No authority or argument is offered to support the contention that such specificity is required, nor do we regard it as necessary. The material question to be decided by the Board was the increase in impairment or disability which was attributable to the injury and its aggravating or accelerating effect. Ind.Code § 22–3–3–12, *supra*. The Board's findings properly specified its rationale and resolution of that issue.

Likewise, Noblesville Casting complains that the Board failed to enter any findings concerning the condition of plaintiff's back and the extent of back pain endured by Prince prior to May 6, 1976. The Board's findings specified that Prince "had no difficulty in performing his job in the year prior to May 6, 1976" and his thirty-five percent impairment prior to that date. These findings adequately specified its resolution of

the material factual disputes before it. *Perez v. United States Steel Corporation, supra.*

## II.

Noblesville Casting also asserts that in various respects, the evidence does not support the findings of fact entered by the Board. At the outset, it concedes that this Court cannot reverse the findings of the Industrial Board unless it conclusively appears that the evidence upon which the Board acted was devoid of probative value, or that the quantum of legitimate evidence was so proportionately inadequate and meager that it reveals the finding under no circumstances could rest on a rational basis, or that the result necessarily was substantially influenced by improper considerations. *Pollock v. Studebaker Corp.*, (1952) 230 Ind. 622, 105 N.E.2d 513; *Harrison Steel Castings Company v. Daniels*, (1970) 147 Ind.App. 666, 263 N.E.2d 288. It is not our prerogative to weigh the evidence or judge the credibility of witnesses in the application of these standards. *Pollock v. Studebaker Corp., supra; Bohn Aluminum & Brass Co., Plant # 9 v. Kinney*, (1974) 161 Ind.App. 128, 314 N.E.2d 780.

Noblesville Casting first argues that finding of fact number 2, wherein the Board found that Prince suffered a "severe strain" on May 6, 1976, is not supported by any evidence of probative value. We disagree. The record reveals that the shift in the weight of the flask imposed a burden of at least 250 to 300 pounds onto Prince's frame. He immediately cried out; witnesses testified that immediately after the weight was removed, Prince was unable to straighten up. Prince testified that he had never before experienced such "very severe" pain, and stated that the pain ran from his back through his groin to his entire left leg. The existence and extent of any strain suffered by Prince was not a matter which could be conclusively established by direct testimony; obviously, however, there was substantial evidence to support the inference or deduction of the Board that a severe strain was imposed on Prince, in light of the cir-

cumstances and testimony regarding the accident. Reasonable men would not be bound to reach the opposite conclusion. *Blue Ribbon Pie Kitchens, Inc. v. Long et al.,* (1952) 230 Ind. 257, 103 N.E.2d 205; *Bohn Aluminum & Brass Co., Plant # 9 v. Kinney, supra.*

Noblesville Casting next challenges the sufficiency of the evidence to support finding of fact number 4 that Prince "was impeded in his performance [of his job] after May 6, 1976." Concomitantly, it maintains the evidence does not support the Board's finding of fact number 6 that "the back and leg pain never left, but rather intensified" and that "This increased impairment resulted in a decrease in the number of hours" Prince was able to work.

Noblesville Casting's arguments invite us to reweigh the evidence and judge the credibility of witnesses. Prince testified that the pain continually increased after May 6, 1976, and that he was unable to continue working some Saturdays, prompting his superiors to transfer him from his department. His testimony was corroborated by foreman Garvin Sexton, who testified that Prince occasionally complained of intense back pain. Foreman Edward Collins testified that Prince was placed on "light duty." Records of the number of hours per week Prince worked prior and subsequent to May 6, 1976, were admitted into evidence.

Based on the foregoing, it cannot be said that the Board's findings were based on evidence which was devoid of probative value or that lacked a requisite quantum of legitimacy. To the extent that the evidence was conflicting and the work records susceptible to various interpretations, the factual findings of the Board rest on the credibility and weight to be accorded the testimony and evidence. It is not our prerogative, consequently, to disturb the findings. Ind.Code § 22–3–4–8 (Burns 1974); *Pollock v. Studebaker Corp., supra.*

Noblesville Casting also challenges the sufficiency of the evidence to support findings of fact numbered 9 and 13. Therein the Board respectively found that "the injury and surgery [spinal fusion] will result in additional immobilization" and that Prince "suffered additional permanent impairment of 15% to the man as a whole."

Notwithstanding the causal connection between the injury and spinal fusion, Noblesville Casting attempts to distinguish the two, arguing there was no evidence that the injury will result in additional immobilization. As Dr. Norman testified, however, the spinal fusion was necessitated by the injury and, while alleviating the pain, would also restrict mobility in Prince's back. He stated that Prince's impairment would approximate "15 percent of the man as a whole . . ." as a "result of his recent episode, plus the necessity of surgery and the type of surgery required."

Noblesville Casting also predicates its challenge on the basis that the medical testimony regarding the link between the injury and impairment was expressed in terms of "possibilities." We rejected such an argument in *Dayton Walther Corp. v. Caldwell,* (1980) Ind., 402 N.E.2d 1252. Justice Pivarnik explained:

"The fact that the doctors were not able to state with any degree of certainty, that this plaintiff would, in fact, have one or both of these diseases, did not reduce their testimony to that of speculation, guess or possibility to the extent that the jury could not consider this potential in weighing the permanent damage occasioned by these injuries. To hold otherwise would virtually wipe out any appraisal by an expert medical witness as to an estimate of permanent future impairments which are involved in their description of present conditions and facts." *Id.* at 1256.

Noblesville Casting's contention consequently is meritless.

Similarly, Noblesville Casting argues that findings of fact numbered 12, 13, and 15 were not supported by sufficient evidence in that the findings rested on medical testimony couched in terms of possibilities. Findings 12, 13, and 15 concerned the causal connection between Prince's pre-existing condition, his injury, and his subsequent physical condition, as well as the surgery

and his subsequent disability and impairment.

We rejected these contentions in our discussion of the admissibility and probative value of expert medical testimony, rendered at the outset of this opinion. There, we summarized the extensive evidence to support Dr. Norman's opinion that Prince's back problems were "possibly" attributable to the accident on May 6, 1976. We found the evidence was sufficient to support the Board's factual determination, a conclusion we reiterate here. Insofar as finding of fact number 12, which related to Prince's period of temporary total disability, is concerned, the record reveals that post-operative recovery and healing from the spinal fusion precluded Prince from working between October 18, 1977, the date he entered the hospital, and July 12, 1978, the date he ultimately returned to work. The evidence is sufficient to support the Board's findings of fact numbered 12, 13, and 15.

### III.

Noblesville Casting also maintains that the Industrial Board erred in permitting Dr. Norman to relate statements Prince had made to him concerning his medical history. Its challenge is based on the contention that the statements were hearsay and self-serving.

■ Noblesville Casting acknowledges that the rules of evidence do not apply in their strict form to proceedings before the Industrial Board; likewise, it recognizes that the admission of incompetent evidence is not reversible error if there is other competent evidence to support the award. *Harrison Steel Castings Company v. Daniels, supra.*

■ Here, Prince testified to those same matters which Dr. Norman related in his testimony, which was submitted in deposition form. The admission of the testimony consequently could not be reversible error. *Id.* Furthermore, Prince was available for cross-examination, and the admission of the deposition statements therefore was proper pursuant to *Patterson v. State*, (1975) 263 Ind. 55, 324 N.E.2d 482.

■ Finally, Noblesville Casting contends that the Industrial Board erred in permitting Dr. Norman to answer the two hypothetical questions heretofore quoted; it asserts the questions were improper because material facts were both omitted and misstated. In *Dahlberg v. Ogle*, (1978) 268 Ind. 30, 373 N.E.2d 159, this Court held that hypothetical questions are not improper merely because facts pertinent to the evidence are omitted since a remedy is available via cross-examination. Insofar as the alleged misstatement of material facts, which related to the statement that the accident occurred on May 6, 1977, rather than May 6, 1976, is concerned, the record reveals Noblesville Casting withdrew its objection to the hypothetical question on that basis by permitting Prince's counsel to amend the record to reflect the proper date. There was no error in admitting Dr. Norman's answers to the hypothetical questions.

For all the foregoing reasons, there was no error in the Industrial Board's proceedings and its award must be affirmed. The decision of the Court of Appeals is reversed and vacated.

Award affirmed.

PRENTICE, J., concurs.

PIVARNIK, J., concurs in result with opinion in which GIVAN, C. J., concurs.

DeBRULER, J., not participating.

PIVARNIK, Justice, concurring in result only.

I concur in result only because I cannot agree with the Majority that the opinion or conclusion of an expert based only on "possibilities" is probative evidence.

The Majority has very well stated that liability or an award of damages may not be predicated purely on speculation or guess. Neither can evidence which speaks only to possibilities be admissible as probative evidence, regardless of the status of the witness giving it. In its analysis, the Majority pointed out that in *Palace Bar,*

(1978) 269 Ind. 405, 381 N.E.2d 858, the reliability of the analytical methods employed were stated as "possibilities," since the doctors testified that it was possible that death could be caused from certain events. Therefore the total testimony of the expert witness was based on possibilities. In *Kostamo v. Marquette Iron Company,* (1979) 40 Mich. 105, 274 N.W.2d 411, medical experts testified that stress can cause heart attacks; that the effects of stress are exacerbated by arteriosclerosis; that the opportunity for a heart attack increases thereby and that stress may be the product of anxiety, fear, exhilaration, fatigue, and environmental conditions. Thus, it was stated not as possibility but as accepted in the fields of medical learning that these things are true. When we speak of "reasonable medical certainty," we are speaking of this type of learning and this type of acceptance of fact. Reasonable medical certainty does not mean absolute certainty.

It is true that when we attempt to qualify degrees of certitude in the terms employed by witnesses, we can get into problems of semantics. It is also true, however, that when we deal with expert witnesses we are dealing with people with a high level of education, knowledge, and understanding and who are certainly able to express themselves. We are also dealing with witnesses who are not eyewitnesses to anything but who are giving opinions based on facts given to them or conditions they observe at the time. It is impossible for every expert witness to testify with certainty that a given scientific fact or result is apparent. But by applying his experience in the field and the analytical processes to which he testifies, his certainty must be of such a degree that it is more than a bare possibility. As the Majority has amply pointed out, in our pronouncements and those of other jurisdictions, when an expert witness has testified that his conclusion is based on "probabilities" or could be as a result of his observations, then this has been admissible. Precise and exact words need not be required but testimony must be given that has some probative weight and value. When any expert witness is asked if a certain thing is possible there is hardly a time when he could answer other than, "yes, it is possible." This is of no value in the fact-finding process.

In this case, Dr. Norman actually expressed more than possibilities. Even though he used the word "possible" in some of his statements, his resultant analysis connoted more. I agree that there were facts and circumstances presented from which the Board could reasonably find that Prince's injury could reasonably have been considered an aggravation of a pre-existing condition. This is also true from Defendant's testimony and from other witnesses who observed him both at the time of his injury and subsequent to it. Dr. Norman's testimony can also be interpreted in this manner. His testimony in sum was that even though Prince had a pre-existing condition, the accident described could have contributed to an aggravation of that condition. I therefore agree that the award of the Industrial Board should be affirmed.

GIVAN, C. J., concurs.