THE STATE OF OHIO, APPELLEE, *v.* AUSTIN, APPELLANT.

(No. 76AP-345—Decided October 7, 1976.)

*Mr. George C. Smith*, prosecuting attorney, and *Mr. Alan C. Travis*, for appellee.

*Mr. James M. McCord* and *Messrs. Taylor & Ludwig*, for appellant.

McCORMAC, J. Appellant was indicted for the aggravated murder of his wife, Michele J. Austin, on March 1, 1975. To this charge he entered a plea of not guilty. A trial by jury was waived, and, after trial before the court, appellant was found guilty of the lesser included charge of murder and sentenced according to law.

From the judgment of the trial court, appellant has filed a timely notice of appeal, setting forth the following assignments of error:

"1. The court erred in failing to sustain defendant's motion to suppress illegally obtained evidence.

"2. The court erred in refusing to suppress the evidence elicited from the illegal search.

"3. The court erred in refusing to sustain the motion to discharge the defendant since the state failed to establish the *corpus delicti.*

"4. The hypothetical question presented by prosecution to the pathologist was improper in scope and information contained therein: improper because it was presented on redirect examination, improper because it required speculation as to cause of death.

"5. The judgment of the trial court was against the manifest weight of the evidence and not supported by sufficient evidence to prove the defendant guilty beyond a reasonable doubt.

"6. The court erred in its determination that the evidence was sufficient to establish the requisite degree of intent to murder.

"7. The court permitted the prosecutor to cross-examine the defendant about 'other acts' of violence in violations [*sic*] of R. C. 2945.59."

The body of Michele J. Austin, the wife of appellant, was found floating on the water in Hoover Reservoir on July 5, 1975. It was wrapped in a flowered bedsheet and a blanket secured by tire rims attached by coat-hangers and a log chain. The body was immediately sent to Cincinnati where Dr. Paul Jolly, the chief deputy coroner of Hamilton County, an expert in pathology, performed an autopsy. He found that the body was very badly decomposed, having been in the water for a period of more than four months. The body weighed seventy-six pounds at the time of the autopsy. Other testimony showed that the victim weighed about one hundred and sixty pounds on March 1, 1975, at the time of the death. Because the body was badly decomposed, Dr. Jolly was unable to establish with absolute certainty the cause of death, but stated that it was probably drowning. When asked about the use of the term probability as opposed to reasonable medical certainty, he

stated that he considered certainty to be 99.9 percent and probability a bit below that. He found no evidence of trauma as much of the flesh had decomposed, but did not completely rule out the possibility of death by asphyxiation. It was stipulated that through dental charts experts would testify that the body was that of Michele J. Austin.

Following the discovery of the body, on July 5, 1975, the police department conducted an investigation. Conversations with relatives of the victim and a neighbor indicated that appellant and his wife were having domestic problems and that appellant had stated that his wife had left home after an argument, leaving her baby behind. The investigation disclosed that appellant had been very reluctant about filing a missing person report. A neighbor identified the flowered bedsheet wrapped around the victim as being similar to that owned by appellant and his wife.

Armed with this information and with the finger of suspicion very strongly pointed towards appellant, police officers came to his trailer on the afternoon of July 11, 1975, at about 2:25 p. m. They did not advise him that his wife's body had been found, but asked him if he would show them his wife's clothing, and in particular, bed clothing from the doublebed used prior to the time that his wife had left. Bed clothing of a flowered pattern that appeared to be the same as that wrapped around the victim was found in a drawer. The police officers then asked appellant to go with them to police headquarters. Inside police headquarters, at approximately 3:07 p. m., appellant was asked if he would sign a consent to search form. Appellant signed that form and police officers were immediately dispatched to the trailer to obtain the flowered bedding. At 3:15 p. m., police officers fully explained the *Miranda* rights to appellant, who voluntarily signed a waiver form. Before questioning appellant, the officers told him that they had found his wife's body and that they believed he had killed her. Defendant initially denied any involvement in the death several times, but shortly thereafter gave the police officers the following statement: (Reproduced verbatim)

"I had jest got Jr asleep and she got hiper over me working nights. I trid to get her to cem down I couldn't so I went in to the bed room and turned on the T. V. She came in and started, I trided to get her to set down and be sinabule and not to wake Jr. But she disagree so I trided to held her so I could talk to her need thing I know blood was comeing from her mouth I stoped and look at her, I didn't know what to do I just look at her for I don't know how long.

"I think Jr. cryed so I went and got him and took hem to my auts house, drove a round for I don't know how long then I went home and waped her up in blankets and put her under the bed, later that night I put in the van with a loging cange and some tire rems and took her and put her in the rasevier.

(Signed) Zachary Austin"

During the course of the trial, appellant's written and oral statements to the police officers were admitted into evidence after the previous testimony had been admitted, over objection of appellant's attorney who contended that the *corpus delicti* had not been established, and that the statement was not admissible as not being voluntary. A pretrial motion to suppress the statement had been filed, heard and overruled.

After the prosecution rested, the defendant took the stand and basically admitted his statement claiming that his wife's death was accidental when she became hysterical during an argument, and he was attempting to restrain her. The defendant admitted that he did not call the emergency squad, police or anyone else, but contended that he became panicky and subsequently disposed of the body in Hoover Reservoir.

The first two assignments of error will be discussed together as they are interrelated.

Appellant contends that he was effectively under arrest and in custody at the time of the officers' initial visit to his trailer, because one of the officers stated that appellant would have been arrested on the spot had he not cooperated. However, what transpired at the trailer was merely a re-

quest to see some of the victim's possessions, *i. e.*, a consent to search. No statements were obtained from the appellant and the only answer that could be considered incriminating was the affirmative response to a question asking if any of the bed clothing from the doublebed was still in the house. The bed clothing was indicated to the officers as being in a drawer and it was observed by them.

Appellant argues that even this limited questioning without *Miranda* warnings violated the self-incrimination rights of appellant (pointing to the case of *Orozco* v. *Texas* [1969], 394 U. S. 324), thus rendering inadmissible both the answer and testimony concerning the bed clothing observed therein and obtained thereafter by the use of a search warrant.

There was no requirement that a *Miranda* warning be given at the trailer, as no incriminating statements were sought or obtained. The only question asked was in regard to the location of the bed clothing in the trailer. Any impropriety would thus pertain to the consent to search rather than self-incrimination through statements.

The issue then is whether the officers were required to inform appellant that he had a right to refuse to consent to the search of the trailer in order to demonstrate that the consent was voluntary and not the result of duress or coercion, expressed or implied. The United States Supreme Court has made clear that no such warning is required if the subject of the search is not in custody. See *Schneckloth Conservation Center* v. *Bustamonte* (1973), 412 U. S. 218. However, it would appear that appellant was effectively in custody at the time the officers visited his trailer as their testimony makes it clear that he would not have been permitted to depart their custody at that time, even though he was not told that he was under arrest. No issue has been presented as to whether the search was proper as being incident to a valid arrest.

The weight of authority holds that prior *Miranda* warnings are not required to validate consent searches, even when the consent is obtained after the defendant is effectively in custody. See *United States* v. *Garcia* (C. A. 5,

1974), 496 F. 2d 670, 673, where the court stated as follows:

"The test in either situation remains the same. Voluntariness is a question of fact to be determined from all the surrounding circumstances, and custody like the subject's knowledge of a right to refuse, is only one factor that should be taken into account."

As the court pointed out in *Garcia*, a search and seizure produces real and physical evidence, not self-incriminating evidence subject to potential constitutional evil. In case of a search, the incriminating material is either in the presence of defendant or is not. Thus, while the Fourth Amendment prescription against unreasonable searches and seizures is as important as Fifth Amendment rights against self-incrimination, it has not been recognized as promoting the integrity of the trial process. See *Schneckloth Conservation Center* v. *Bustamonte, supra.* There is no infallible touchtone for determining whether a consent is voluntary or whether it has been coerced. Viewing all the factors in this case, including the possibility of subtly coercive police questions as well as the possibly vulnerable subjective state of the defendant, we do not find that the trial court erred in finding that the consent to search, both at the trailer and later at the police station, was involuntary despite the lack of *Miranda* warnings.

The statement given to the police officers by appellant at the police station was made after appropriate *Miranda* warnings were given and without threats or coercion. The only contention in regard to this statement is that appellant would not have made it if he had not been aware that the officers already knew that a bedsheet from his trailer could be connected to the body of the victim. As previously held, since information concerning that sheet was properly obtained, the statement of the apellant in the police station was not illegally obtained. However, even if it were decided that there was a violation of the Fourth Amendment rights by the search of the trailer and an execution of the subsequent consent to search it, the statement was not a fruit of that search, since the police had evidence

from an independent witness that a sheet similar to that on the body had been seen in the trailer. Thus, the fact of seeing the sheet in the trailer had little, if any, effect on the questioning of appellant.

Moreover, appellant voluntarily took the stand on his own behalf and admitted disposing of the victim's body, using the sheet from a bed in his trailer and, further, testified consistently with the written statement obtained at the police station.

Assignments of error numbers 1 and 2 are overruled.

The third assignment of error states that the state failed to establish the *corpus delicti*. The *corpus delicti* in a homicide prosecution, meaning the body or substance of a crime charged, involves two elements: (1) the fact of death, and (2) the existence of the criminal agency of another as the cause of the death. See *State* v. *Manago* (1974), 38 Ohio St. 2d 223. In this case, the fact of death is not contested and was clearly established. Appellant contends, however, that the prosecution did not establish that the criminal agency of another was the cause of the death. Dr. Jolly testified that the probable cause of death was drowning, but that there was a possibility that the death could have been from asphyxiation or drowning in the person's own fluids prior to being placed in Hoover Reservoir. However, appellant contends that Dr. Jolly's testimony left open the question of whether drowning was by accidental means rather than through a criminal agency, as well as the possibility of death by other natural means. That contention completely ignores the condition in which the victim's body was found. The victim's body was found wrapped in a sheet and blanket and weighted down. Obviously, the victim did not place herself in this position. The finding of a body in this condition surely is sufficient to establish, beyond a reasonable doubt, that death occurred as a result of the criminal agency of another, even if it is necessary to prove that element beyond a reasonable doubt to establish the *corpus delicti*, so that the admissions or confessions of the defendant can be admitted into evidence. This case is clearly distinguishable from *Manago*, where

it was possible that the alleged victim met her death by accidently falling down a flight of steps, rather than at the hands of a criminal agency. In *Manago, State* v. *Rosenberry* (1938), 134 Ohio St. 108, was cited with approval. In this case, as in *Rosenberry*, no reasonable doubt exists that the victim died of unnatural causes.

Appellant should not benefit from an understandable lack of complete certainty as to the exact cause of death because of the victim's advanced state of decomposition, resulting from appellant's unlawful disposition of the body. Again, there is no reasonable doubt that death was caused through some type of criminal agency. Assignment of error number 3 is overruled.

Appellant's fourth assignment of error is that the opinion of Dr. Jolly as to the cause of death should have been excluded as it required speculation as to the cause of death.

The testimony of Dr. Jolly was as follows:

"Q. Doctor, do you have an opinion, based on your experience as a pathologist, based on your complete examination of this particular body, as to the cause of death?

"A. I would have to qualify my answer depending on the degree of certainty with which you would like this opinion expressed. In terms of probabilities, I would think that drowning is the most likely cause of death. In the—in terms of reasonable medical certainty, I would have to say I do not know."

However, later in Dr. Jolly's testimony, he clearly stated his definition of reasonable medical certainty:

"Reasonable medical certainty I would reserve for the type of case where an individual dies as a result of a gunshot wound where it can be stated as close to factual as is humanly possible that death is in fact due to that gunshot wound. Here, in this particular case, I had certain handicaps because of the decomposed state of the body and other corroborative evidence that might have been available to me had the body been received immediately after drowning that could possibly have permitted me to state with certainty that death was due to drowning."

On cross-examination, Dr. Jolly's definition of reasonable medical certainty was made more clear:

"Q. Doctor, your bottomline conclusion of death by drowning—you state to me that that is an—a probability?

"A. That is a probability.

"Q. But you say it cannot be a probability that is to a medical certainty?

"A. Medical cer—when I speak of medical certainties, I like to be up in the ninety-nine point nine nine percentage range. This is a bit below that.

"Q. This—this does not reach a medical certainty in your opinion as a—as—as a trained doctor?

"A. It is a little less than certain."

Consequently, it is clear that Dr. Jolly testified that there was a probability, not a possibility, that the cause of death was drowning. The test as to the admissibility of the opinion of a doctor is as follows:

"* * * [T]he witness must connect the two with reasonable medical certainty. Probability, and not possibility, is required. And, see *Shepherd* v. *Midland Mutual Life Ins. Co.*, 152 Ohio St. 6, 87 N. E. 2d 156, 12 A. L. R. 2d 1250, holding that in 'the interpretation of certain scientific facts' by a qualified witness, the opinion he expresses must be based on 'probability' or 'actuality.' " *State* v. *Holt* (1969), 17 Ohio St. 2d 81, 85.

Appellant also complains that other answers as to speculative causes of death were improperly admitted into evidence. On both cross-examination and redirect examination, the pathologist was asked to express opinions relating to possible causes of death in reference to the manner of death contained in appellant's statement. There was no prejudicial error committed in admitting the answers.

The trial court entered a general verdict, finding appellant guilty of murder by purposely causing the death of Michele J. Austin. In a brief discussion of the verdict which did not purport to be separate findings of fact or to be exhaustive, the trial court explained that, even by the defendant's own story, he used his physical strength to such an extreme and duration that it caused the death of the

victim. That finding is consistent with the testimony of the defendant, the only actual witness to the death, and not inconsistent with the possibility of asphyxial death which was not ruled out by Dr. Jolly. Actually, that finding gave defendant, at least partially, the benefit of doubt as to the cause of death, as a finding of death by drowning would probably have led to a verdict of guilty of aggravated murder, as premeditation could then have been inferred. Assignment of error number 4 is overruled.

The fifth and sixth assignments of error are combined for discussion as they both relate to the finding by the trial court that appellant purposely caused the death of his wife. Appellant contends that there was no direct evidence and insufficient circumstantial evidence of an intent to kill on the part of defendant, and, moreover, that the circumstantial evidence is as consistent with a theory of accidental death as with a theory of intentional death, citing *State* v. *Kulig* (1974), 37 Ohio St. 2d 157, as authority.

We disagree with these contentions of appellant. The state of the defendant's mind, his intent, is usually a question of fact that can be inferred from what defendant did or said. *State* v. *Wallen* (1969), 21 Ohio App. 2d 27. The inference of intentional death is arrived at by the testimony of the unnatural death of his wife after evidence of considerable marital disharmony. There is unequivocal evidence that the actions of appellant caused the death of the wife, whether by force during the argument in which they had been involved, or by drowning after she had been dumped in Hoover Reservoir. No one is able to say with absolute certainty how the actual death occurred, as the concealment of the body by appellant prevented the pathologist from making that determination to an absolute certainty. However, an inference of a guilty intent may be drawn from the direct evidence that the decedent's body was concealed. The concealment or attempted destruction of a dead body has frequently been regarded as so strong an incriminating circumstance as to overcome a defense that the death was due to an accident, and that the body was hidden through fear. See 40 American Jurisprudence 2d 708, Homicide, Section 449.

In fact, the concealment or destruction of a body is a circumstance permitting not only an inference of guilt as to homicide, but may also be considered in finding premeditation. See *State* v. *LaChance* (Tenn. 1975), 524 S. W. 2d 933. Even by appellant's own testimony, sufficient force was applied to his wife's neck that bloody foam came from her nose and mouth. Reasonable inferences that emanate from the natural and probable consequences of defendant's actions may be taken into account by the trier of the fact. From the circumstances herein, the trial court was fully justified in finding that appellant purposely caused the death of his wife. Assignments of error numbers 5 and 6 are overruled.

The seventh assignment of error is that the prosecutor was improperly permitted to cross-examine the defendant about other acts of violence contrary to R. C. 2945.59, to show that he was "violence prone." Defendant took the stand and claimed that the death of his wife occurred as a result of an accident rather than from any intent on his part to harm her. In cross-examination, defendant was asked about a fight that he had with a certain individual named Terry. The defendant admitted that he very badly beat Terry because appellant was wrongfully accused of fooling around with Terry's wife. There was no objection to this line of inquiry by appellant. The second incident involved an automobile driver upon whose person appellant offered to commit an act of violence because his driving irritated appellant. An objection to the latter inquiry was overruled by the trial court.

Each of these questions were asked to negate the claim of defendant that his actions were not intentional when admittedly he caused the death of his wife. R. C. 2945.59 permits the admission of evidence of any acts of defendant which tend to show that his motive or intent, or the absence of mistake or accident on his part, whether contemporaneous with or prior or subsequent to the act in question, in any criminal case where the defendant's motive or intent, or the absence of mistake or accident on his part, is material. Thus, the evidence was properly received in this case pursuant to R. C. 2945.59. This is particularly true

when the case is tried to the court because the likelihood of a misuse of the evidence is greatly reduced. Moreover, the only evidence to which there was an objection was relatively mild and, even if error, was harmless. It is presumed that a judge considers only the relevant, material and competent evidence in arriving at a judgment, unless it affirmatively appears to the contrary. *State* v. *White* (1968), 15 Ohio St. 2d 146, 151. The seventh assignment of error is overruled.

Appellant's assignments of error are overruled and the judgment of the trial court is affirmed.

*Judgment affirmed.*

WHITESIDE and REILLY, JJ., concur.