Marcia **HEALD**, Appellant,

v.

**STATE of Indiana**, Appellee.

No. 983S324.

Supreme Court of Indiana.

May 14, 1986.

Allen Wharry, Martin, Wharry & Disler, Lebanon, Brent Westerfeld, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Michael Gene Worden, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Chief Justice.

Appellant was convicted by a jury of Murder and Burglary. The court imposed concurrent forty (40) year and thirty (30) year sentences.

The facts are: Brian Thornton was a mutual friend of appellant and the victim, Shelley Smith. Appellant had developed a delusional pattern of thought in which she perceived Thornton to be Jesus Christ and herself as Eve, a missionary from God or the Mother Mary. Appellant became aware during the summer of 1982 of a strong emotional relationship between Thornton and Smith. Within the framework of appellant's delusion, Smith was the temptress of Christ. Appellant referred to Smith as a serpent and as the "Lady of Illusion."

During the early evening of August 1, 1982, appellant and Thornton were driving from appellant's home in Plainfield to Thornton's home in Lafayette. At Thornton's suggestion, they went to Smith's home in Lafayette. They arrived at the residence at 8:00 p.m. and visited with Smith, her husband Gerald and others until 10:00 p.m. At that time appellant, Thornton and the victim went to Thornton's residence. They stayed there until after midnight. Then, at Smith's invitation, appellant and the victim returned to Smith's home.

At approximately 2:00 a.m., on August 2, Gerald Smith arose from bed to prepare for his work as a deliveryman. He found appellant and the victim engaged in conversation in the living room. After briefly conversing with the couple, appellant left the residence. Gerald Smith continued his preparations and Shelley Smith retired to her bedroom. Gerald Smith testified when he left at 3:00 a.m. the victim was in bed and he believed she was asleep. Gerald Smith carefully closed but did not lock the door when he left.

Before 6:00 a.m. appellant returned to the home. She entered through the front door and went to a downstairs bathroom. There she removed all of her clothes. She proceeded to the kitchen where she obtained a paring knife. Appellant then went to the bedroom where she found the victim asleep on her back. Appellant struck Smith with the knife in the area of the throat. The wound severed an artery but did not cause immediate death.

The women struggled and Smith received several superficial wounds. Appellant pulled Shelley Smith through a bathroom and into a hallway. Smith collapsed from the loss of blood in the hallway. Following the collapse, appellant went to the kitchen to obtain a larger knife to replace the one broken in the struggle. With the larger knife appellant attempted to decapitate Smith. When this effort failed, appellant dropped a large plate glass mirror on Smith's head. Appellant then took a section of broken glass and attempted to sever the victim's head from the body. After nearly accomplishing this task, appellant gave up the effort. She returned to the downstairs bathroom, showered and dressed. She then placed several telephone calls from the Smith residence. Two were long-distance telephone calls to her sons. Appellant then left the residence and returned to her automobile.

While in the automobile, appellant became aware of several lacerations to her hands. She drove to a nearby hospital where personnel in the emergency room removed glass particles from her hands and sutured her wounds. She then drove around the city of Lafayette for several hours. She arrived at Thornton's home after noon. Thornton was not at home and appellant went to sleep in the swing on the front porch.

Gerald Smith returned home at 8:30 a.m. and discovered the body. He immediately called the police. As part of their investi-

gation, the police obtained the names of all persons who had been in the home recently. Gerald Smith supplied the names of Thornton, appellant and others.

While the police were at the home conducting the investigation, Thornton telephoned and asked to speak with the victim. After being informed of the death, the police requested an opportunity to speak with him. A police vehicle was dispatched to bring Thornton to the police station. Thornton provided the police with information concerning appellant's bizarre perception toward himself and the victim. He also informed the police that appellant was not a resident of Lafayette. While Thornton was being interviewed, police received information that appellant was at Thornton's home.

Two plainclothes officers, in an unmarked car, were dispatched to Thornton's home. The officers introduced themselves and stated they were investigating Shelley Smith's death. They asked appellant if she would be willing to be interviewed. Appellant consented and entered the police car. At no time were weapons drawn or any restraints used by the police. Appellant inquired whether she was under arrest and was told she was not. Officers testified their primary focus, as to appellant, was the fact she had been in the home the night before the incident and that she was an out of town witness who might return home at any time.

After entering the police vehicle, an officer read appellant her *Miranda* rights. When she arrived at the station, these rights were repeated and she signed a waiver. Initially, appellant acknowledged being in Smith's home at 2:00 a.m. but denied any knowledge of the homicide. She explained her bandaged hands were the result of a fall on the brick sidewalk at Smith's residence. With intermittent breaks for refreshments and use of the rest room, the interview continued. During this time appellant was again informed she was not under arrest. The tape recording of this interview reveals the police were soon aware of appellant's bizarre thought pattern and certain inconsistencies within her explanation.

Later that day appellant changed her version of the incident and gave the police an inculpatory statement. She was then arrested and a tape-recorded version of the statement was made. Appellant also executed a document authorizing the police to conduct a complete search of her handbag. This search resulted in the police confiscation of a stamped but unsealed envelope addressed to appellant's son. The police opened the envelope and recovered a letter which contained incriminating statements.

Before trial, appellant filed a motion to suppress the confession, the letter and other physical evidence gathered after the statement. This motion was denied. She contends this evidence was the product of an unlawful arrest. She argues she was arrested by the police at Thornton's home without probable cause. She argues she was "seized" within the Fourth Amendment meaning of that term when the police asked her to accompany them to the station. She further contends that at that moment no probable cause existed to support the arrest.

This Court has held that not every encounter between a citizen and a law enforcement officer constitutes a seizure within the meaning of the Fourth Amendment. The test to determine when a person has been seized is "whether, considering all the circumstances surrounding the police-citizen encounter, the defendant entertained a reasonable belief that he was not free to leave." *Dunaway v. State* (1982), Ind., 440 N.E.2d 682, 685.

The United States Supreme Court has applied this same standard to the determination of when an initially consensual encounter between citizens and law enforcement officers has been transformed into an arrest. *Immigration and Naturalization Service v. Delgado* (1984), 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247.

■ In the case at bar appellant was informed at Thornton's home, in response to her own question, that she was not un-

der arrest. We find appellant was not under arrest when she left for the police station. Her decision to accompany the police was voluntary. Her early statements to the police were part of a consensual interview.

◼ The question of whether this formerly consensual interview was transformed into an arrest by four hours of interrogation is a closer question. After reviewing the record, we conclude that, at a point prior to appellant's initial incriminating statement, she no longer entertained a reasonable belief she was free to leave the police station. The question then arises as to whether, at that same moment, probable cause existed to support the arrest. Probable cause to arrest without a warrant exists if the facts and circumstances known to the officer would warrant a man of reasonable caution to believe the defendant had committed the criminal act in question. *Gee v. State* (1984), Ind., 471 N.E.2d 1115.

◼ Shortly after the police first contacted appellant they had in their possession the following information. By her own admission she was one of the last two people to be with the victim. The victim's neck was nearly severed and a section of broken mirror and several knives were found in the vicinity of the body. Appellant had several wounds to her hands for which she had sought treatment only hours after the incident. Thornton had told the police of appellant's delusions relative to Smith and himself. Included within that information, were threats against the "Lady of Illusion" and the necessity of severing the head of the evil serpent. Appellant had provided a highly suspicious explanation of her activities from 2:00 a.m. until the time she had sought medical attention at approximately 9:00 a.m.

We conclude, under the facts and circumstances, the police did have probable cause to arrest appellant at any time after she gave her initial statement. The trial court did not err when it admitted the evidence as it was not the product of an unlawful arrest.

◼ Appellant contends the trial court erred when it failed to suppress the confession on grounds it was taken in violation of guarantees established in *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 and *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378.

Under *Miranda*, once the warnings have been provided to a person under custodial interrogation, if the person indicates in any manner his desire to remain silent, then the interrogation must cease. Appellant contends that on three occasions she did in fact indicate her desire to remain silent. Twice in response to questioning she stated: "I don't believe I have anything else to add." At another point in the questioning she replied in the negative to the question, "Do you have anything else that you would like to tell me freely or on your own without any questions at this time"? These questions occurred after appellant was under custodial interrogation. Appellant maintains all three of these statements represent an assertion of her desire to remain silent. Thus she contends the continued police questioning after the assertion renders the confession inadmissible under *Miranda*.

We find these statements do not represent an attempt on the part of appellant to assert her right to remain silent. The statements are not sufficiently emphatic to constitute an invocation of the right. By these statements appellant was merely indicating that she had no further information to convey concerning the particular matter under discussion.

◼ Appellant contends the dictates of *Miranda* and *Edwards* were violated when the police continued to question appellant following assertion of her desire to have counsel present during questioning. *See Romine v. State* (1983), Ind., 455 N.E.2d 911.

This issue centers around the activities of the police shortly after appellant arrived at the station. During her ride from Thornton's home to the station, appellant

was given a full *Miranda* advisement. At the station, as Detective Bennett was reading the advisements a second time, appellant indicated that perhaps she should talk to a lawyer. The officer replied that first she should finish reading the advisements. When this was completed, the officers inquired whether appellant desired to talk to them. Appellant indicated that she would talk with the police and she signed a waiver of rights. The police then turned on a tape recorder. With the tape recorder in operation, the police reviewed the various waivers and specifically asked if she wanted a lawyer present. She stated she did not and proceeded to give the police a statement in which she did not implicate herself in the homicide. It was later in the day, following several other advisements of rights, that appellant first provided an inculpatory statement.

Appellant's argument is without merit on two grounds. First, at the time of appellant's statement concerning counsel, she was not subject to custodial interrogation. As discussed above, at the time she entered the station she was involved in a consensual interview with the police. The *Miranda* and *Edwards* rights apply only to custodial interrogation. *Edwards, supra* and *Romine, supra.* Secondly, assuming *arguendo* the statement was made in the course of custodial interrogation, there is sufficient evidence to demonstrate beyond a reasonable doubt appellant relinquished or abandoned the right to counsel. *Romine, supra.* Her statement that she did not desire the presence of counsel is sufficient to support that determination.

■ Appellant contends the State failed to establish beyond a reasonable doubt her incriminating statement was voluntary. She points to several events that transpired during the interrogation which she contends established that the confession was not the product of free will but rather undue police pressure. The State has the burden to prove beyond a reasonable doubt that the confession was voluntarily given. In considering whether this burden has been met, we look at the totali-

ty of the circumstances to determine whether there have been any inducements by way of violence, threats, promises or other improper influences. *Mitchell v. State* (1983), Ind., 454 N.E.2d 395; *Grassmyer v. State* (1981), Ind., 429 N.E.2d 248.

■ A review of the record in its totality reveals the statement was voluntary. Appellant was provided a full set of warnings on at least three occasions prior to the statement. She indicated she understood these rights. Although she was questioned for a total of four hours, the time was broken by breaks for refreshments and use of the rest room. None of the factors cited by appellant allege the use of physical intimidation or promises. Rather, the recorded examination reveals the police, being cognizant of appellant's mental condition, showed deference and kindness to appellant. We find the statement was admissible.

Appellant argues the trial court erred on three occasions during the examination of the three psychiatrists appointed pursuant to Ind.Code § 35–5–2–2 (recodified as Ind. Code § 35–36–2–2). The court called all three as the court's own witnesses and examined each concerning their training and experience. The court then inquired as to the number and nature of the examinations conducted on appellant. Each doctor was questioned concerning the tests performed and the written material reviewed in arriving at their expert opinion on the issue of sanity at the time of the incident. Appellant then cross-examined each doctor and the State did likewise.

Appellant argues the court improperly refused to permit recross-examination of Dr. Davis. Secondly, the court improperly limited the parties to twenty minutes of cross-examination per side per doctor. Lastly, she contends the trial court improperly denied her the opportunity to pose two hypothetical questions to one of the psychiatrists. She maintains these errors denied her the right to cross-examine witnesses and the right to present evidence in her behalf. She argues these rights take on a greater significance on the issue of insanity

678

because the defendant is required to establish her insanity by a preponderance of the evidence. *See* Ind.Code § 35-41-4-1(b).

The trial judge has the duty to manage the trial and has the discretion to make determinations and rulings involving the examination of witnesses. *Marbley v. State* (1984), Ind., 461 N.E.2d 1102. This duty extends to determinations concerning the length of examination and the manner and mode of examination. *Camarillo v. State* (1980), Ind.App., 410 N.E.2d 1202.

As to appellant's contention that she was entitled to an opportunity to recross-examine Dr. Davis, we find no merit. The trial court explained its decision to preclude further examination by appellant after the State had concluded on the basis that the statute, Ind.Code § 35-5-2-2, does not provide for such an opportunity. The statute is silent on the issue. Appellant asserts that the examination was essential to rehabilitate the witness following cross-examination by the State. She envisions this as an additional opportunity to present evidence in her behalf.

This Court recognizes the trial judges of the state have taken different approaches to the question of permitting recross-examination in this situation. The psychiatrist called, pursuant to Ind.Code § 35-5-2-2, is the court's witness and the method of examination takes on a form different from that used for a typical witness. We believe the trial court is in the best position to evaluate whether additional examination is necessary to assist the trier of fact. Thus we hold the determination of whether to permit recross-examination is to be at the discretion of the trial court and its ruling will be reviewed under the abuse of discretion standard. In order to show abuse of discretion, appellant must demonstrate actual prejudice by the court's action. *Marbley, supra.*

Applying the standard to the case at bar we find no abuse of discretion. Dr. Davis testified that, under examination by the court, he had reached the opinion that appellant was legally insane at the time of

the incident. This was done after the court, through its examination, had established the credibility of the witness and the foundation for the opinion. Appellant was given ample opportunity to further strengthen that opinion in the minds of the jurors during her examination of the witness. Any additional examination in an effort to respond to the examination conducted by the State would have been cumulative of the evidence already before the jury.

Appellant contends the trial court improperly limited examination to twenty minutes per party per doctor. As outlined above, the trial court does have the authority to control the extent of cross-examination. *Marbley, supra.* Taking into account the amount of time taken by the court in establishing the qualifications of each expert and the foundation for the opinion of each doctor, we do not believe twenty minutes would be an insufficient amount of time to cross-examine each expert.

Appellant challenges the trial court's decision to sustain two objections by the State to hypothetical questions posed to Dr. Davis. The trial court has broad discretion in controlling the use of hypothetical questions as a means of eliciting expert opinions. *Jones v. State* (1982), Ind.App., 435 N.E.2d 616. The State objected to the first hypothetical question on the grounds it did not require the opinion to be given "within a reasonable medical certainty." The court sustained the objection.

We have reviewed the record and find no abuse of discretion in sustaining the objection. The primary responsibility of the expert witness called in this situation is to provide information to the trier of fact on the issues of sanity at the time of the incident. In addition to factual information, the expert may offer an opinion on the issue of sanity. Inherent in the purpose of such testimony is the concept that the opinion is tendered with some degree of certainty. The expert is not re-

quired to offer the opinion with absolute certainty. *Church v. State* (1984), Ind., 471 N.E.2d 306. The degree of deviation from absolute certainty is perhaps unsettled. *See Noblesville Casting Div. of TRW v. Prince* (1982), Ind., 438 N.E.2d 722. The issue is: Does the trial court abuse its discretion when it requires the expert to provide some degree of certainty to support the expert's opinion? We hold he does not.

■ The second hypothetical question to which the State objected provided:

> "Q Okay. And if a person—well, can you render an opinion based upon your interview and your examination and so forth and based upon your diagnosis with reasonable medical certainty as to whether Marcia Heald would have been aware that the person, that the thing that she was striking was, in fact, a human being?"

The State objected to the question on the basis that the witness was not permitted to give an opinion on the question of appellant's general intent at the time of the incident. Jurisdictions throughout the United States, both State and Federal, have had difficulty in determining the admissibility of expert testimony on the issue of a defendant's capacity to entertain the requisite specific intent necessary for conviction. *See* Annot., 16 A.L.R. 4th 666 (1982).

In the instant case we hold the trial judge was correct in permitting psychiatrists to testify as to their expert opinion concerning appellant's general mental capacities and her general ability to form intent at the time the alleged crime was committed. However, we also hold the trial judge was correct in sustaining the objection to the above question. The question goes beyond the mental capacity of the appellant to form intent at the time of the incident in that it asks the expert to give his opinion on the mental processes of appellant at the time she was striking the victim. More specifically, it asks him to state whether or not she realized she was striking a human being. This goes beyond the expert's ability to determine the mental capacity of the witness at the time, but asks him to go into the specific mental processes she was entertaining at the time.

Although there is admittedly a fine line between proper and improper testimony of this regard, we now hold the trial judge ruled properly in excluding such testimony. We agree with the Court of Appeals of Kentucky in the case of *Koester v. Commonwealth of Kentucky* (1969), Ky., 449 S.W.2d 213, 215 wherein it was stated:

> "While opinion evidence of a mental condition may be relevant on the issue of intent or lack of intent at the time of the commission of a certain act, it is going a step farther to accept as competent an opinion concerning the lack of a specific intent on a particular occasion. Then, in effect, the opinion is not evidence of mental condition but is a factual conclusion of the witness on the ultimate issue before the jury which can be reached only by consideration of all the facts.

> "This may appear hypertechnical and the drawing of a fine line between admissible and inadmissible evidence, but the line is there. It is a distinction between the capability or incapability of the accused and his actual mental attitude at a particular place and time. It is the difference between an objective opinion and a subjective conclusion. (Citation omitted.) Or put another way, it is the difference between the mental abnormality and the specific 'product' produced thereby."

We would further point out that the witness to whom the question was posed was not a witness adverse to appellant. The witness was testifying that appellant did not have the mental capacity to form intent at the time of the offense. This he had stated previous to the controversial question and reiterated following the question. The question therefore would not elicit new information from the witness but would presumably have elicited a reiteration of his opinion that she did not have the mental capacity to form the *mens res* to commit the crime. Therefore, even if we were to

rule the question to be improper, there would be no reversible error resulting.

■ Appellant argues the trial court erred when it admitted her confession over an objection that the State had failed to establish, by independent evidence, the *corpus delicti* of burglary. Appellant does not deny the establishment of the *corpus delicti* as to the charge of murder. She asserts, however, there was no independent evidence of an illegal breaking and entering of the victim's home. We find no merit to this argument. The independent evidence supporting the *corpus delicti* is as follows: When Gerald Smith left the home at 3:00 a.m., he closed the front door. The physician who conducted the autopsy testified the fatal wound was struck early in the confrontation. From the evidence the jury could have inferred the victim was struck while she was in bed. The jury could also have inferred appellant did not re-enter the home after Gerald Smith left upon the invitation of the victim. We find this independent evidence is sufficient to support the admission of the confession.

■ Appellant contends the trial court erred when it gave Preliminary Instruction No. 5 which stated:

"The rule of law which throws around the defendant the presumption of innocence, and requires the State to establish beyond a reasonable doubt, every material fact averred in the information is not intended to shield those who are actually guilty from just and merited punishment, but is a humane provision of the law, which is intended for the protection of the innocent, and to guard as far as human agencies can, against the convictin [sic] of those who are innocent and unjustly accused of crime."

She maintains this instruction is improper when an insanity defense is offered. She contends the instruction implies an incorrect method for the application of the presumption of innocence. She contends the instruction creates an inference the presumption of innocence does not apply as there is always some evidence of guilt with an avoidance defense.

Similar instructions have been approved by this Court. *See Green v. State* (1984), Ind., 461 N.E.2d 108 and *Oates v. State* (1982), Ind., 429 N.E.2d 949. In the case at bar the court also gave preliminary instructions on the presumption of innocence and the burden of proof on the State. In light of these additional instructions, we find no error in the giving of the challenged instruction.

■ Appellant maintains the trial court erred when it admitted State's Exhibit No. 41, a letter recovered from appellant's purse. After her arrest appellant signed a form consenting to a complete search of her handbag. Within the handbag the police found an unsealed envelope addressed to appellant's son. Inside the envelope was State's Exhibit No. 41 which contained several incriminating statements. She now contends that her permission to search did not extend to the contents of the envelope.

At trial appellant objected to the letter on the grounds the State had not established a proper foundation to support the admission of the document. Specifically, she alleged the State had failed to establish that she was the author of the letter. Thus appellant's objection at trial is at variance from the issue raised on appeal. An issue may not be raised for the first time on appeal. Appellant's failure to object on this ground at trial results in its waiver. *Beland v. State* (1985), Ind., 476 N.E.2d 843.

We note appellant's consent to search the handbag operated as a consent to search items found within the handbag which were pertinent to the investigation being conducted. A complete search contemplates a thorough search, anything less would be of little value. *See United States v. Torres* (10th Cir.1981), 663 F.2d 1019.

Appellant argues the trial court erred when it admitted State's Exhibit No. 12, a vial of appellant's blood which was used for laboratory analysis. Several days after appellant's arrest and following the appointment of counsel, the State filed a discovery request with the court. The court heard

argument on the issue and issued an order for the production of blood and saliva samples. The blood sample was drawn on the 22nd day of October by a physician. A detective of the Lafayette Police Department was present for the procedure. She took possession of the vial of blood and placed it in an envelope. The envelope was sealed. The officer placed a department identification number on the envelope and placed her initials on the tape sealing the envelope. It was then placed in a locked refrigerator at police headquarters.

On October 25 the officer removed the package and transported it to the State Police Laboratory in Lowell, Indiana. The officer gave the package to the evidence clerk at the laboratory. On October 27 a laboratory technician received the package. He testified it was sealed at that time. He opened the envelope and tested the blood within the vial. He testified this known sample of appellant's blood matched blood found on the mirror at the scene. The technician resealed the envelope. Both he and the detective testified the vial was in substantially the same condition as when they dealt with it earlier.

■ Appellant challenges the sample on two grounds. First, she argues the taking of the sample was a search and seizure under the Fourth Amendment and a search warrant was required absent a showing of exigent circumstances. She is incorrect. This Court has previously upheld discovery orders which authorize the taking of blood samples provided no unreasonable intrusion is involved. *State ex rel. Keller v. Criminal Court of Marion County* (1974), 262 Ind. 420, 317 N.E.2d 433.

Secondly, she contends the State failed to establish a proper chain of custody. We find the evidence above recited is sufficient to make the exhibit admissible. The trial court did not err when it admitted the exhibit.

■ Appellant maintains the trial court erred when it ruled on several occasions that she was competent to stand trial. The trial court held a pretrial hearing on the issue of competency at which time three psychiatrists testified appellant was competent. On the first day of trial, appellant renewed the motion and offered additional testimony on the issue. The motion was renewed on at least one other occasion. In each instance the trial court found appellant to be competent.

Appellant now contends that, although she did have a factual understanding sufficient to assist counsel, she did not have a rational understanding of the proceedings. She cites her testimony in which she described the proceedings as follows: that it was some form of game in which the attorneys were pawns; that the jury of her peers consisted of four-footed animals, probably lions; that she was acting for the Messiah; and that the judge's role was to meddle. She contends these irrational thoughts support the determination that her irrational perceptions of the trial interfered with her right to present a defense in a normal trial setting.

The trial court had the testimony of three psychiatrists that appellant was competent within the legal meaning of that term. We find no error in the determination of the trial court.

■ Appellant avers the trial court erred when it admitted four of the State's Exhibits without establishing a proper chain of custody. The State need not establish a chain of custody for certain items of hard physical evidence which are not fungible in nature. *Green v. State* (1984), Ind., 461 N.E.2d 108.

■ The first exhibit she challenges consists of a steak knife broken in two parts. The handle and a small portion of the blade were recovered from a kitchen table. The remainder of the blade was found in the bathtub near the body. The officer in charge of the investigation ordered the two items placed together in an evidence container. The officer testified the exhibit was substantially in the same condition as the day recovered. During preliminary questioning on the issue of admitting the exhibit, the officer testified no

evidence identification mark was placed on the knife. Further, he indicated the exhibit had been in and out of his office on several occasions. The trial court refused to admit several other knives which were similarly recovered and handled on the grounds the State had not established a proper chain of custody. Appellant now contends the same rationale should preclude the admission of this knife.

Appellant's argument fails due to the nonfungible nature of the broken knife. This exhibit had a unique nature which permitted the witness to identify it as the one recovered from the scene of the incident. Thus no chain of custody was required. The identification by the officer was sufficient to permit the admission of the exhibit. *Green, supra.*

 The second challenged exhibit was the large wooden frame and backing of the mirror. This exhibit was recovered near the body. Photographs taken at the scene and introduced as evidence depict the exhibit in its location near the body. The officer in charge of the investigation identified the exhibit as the one recovered at the home that day. He testified that when the exhibit was transported it was in a sealed container. The serologist and the fingerprint expert indicated the exhibit was in a sealed container when they received it.

Appellant contends the failure of the police to attach identification tags or initials on the exhibit at the time of the recovery precluded its admission. We do not agree. The frame was a unique item. No chain of custody was required. So far as the blood and fingerprints on the frame are concerned, the care in packaging the exhibit did protect the blood stains and fingerprints from possible attempts at alteration or tampering.

The third item consisted of a cutting board recovered from the kitchen of the home. Although this item was not recovered until two days after the incident, photographs of the scene taken on the day of the incident clearly depict the exhibit. Two police officers identified the exhibit. One testified the board was placed in a plastic sack which was then tagged and taken to the police evidence room.

Appellant claims there were no identifying characteristics or marks on the board which connect the exhibit to the photograph. This is a spurious argument. The testimony of the officers was sufficient to admit the exhibit.

The fourth exhibit consisted of blood lifts taken from the kitchen floor. The exhibit was collected on August 4. Two officers, who were present at the collection, identified the exhibit. One testified the lifts were taken from an area of the floor which was depicted in a photograph taken on the day of the incident. The second officer testified she transported the blood lifts to the police station where she repackaged the exhibit. She then initialed the package.

Appellant argues the lift cards themselves are not identified as to the time or place of recovery nor do they have identification marks necessary to permit their admission. Appellant has done no more than merely suggest the possibility of tampering. The testimony of the officer as to the packaging of the exhibit was sufficient to permit its admission.

Appellant contends the trial court erred when it admitted State's Exhibit No. 38, a wedding picture of the Smiths. She argues the photograph was introduced to inflame the passions of the jury. She contends the photograph did not have the slightest tendency to prove a material fact at trial. The State responds that the photograph was relevant to establish the identity of the victim, to establish that the victim was a human being and to permit the jury to visualize the physical characteristics of the victim.

 Photographs are relevant if they depict objects or scenes a witness would be permitted to describe. *Brown v. State* (1983), Ind., 448 N.E.2d 10. The photograph was admitted during the testimony of Gerald Smith. He testified the appearance of the victim in the photograph closely resembled her appearance at the time of

her death. The court did not err in admitting the exhibit.

▮ Appellant contends the court erred when it refused to give two preliminary instructions offered by appellant. The instructions outlined the post trial procedures followed if the jury rendered a verdict which found her not responsible by reason of insanity. An appellant is not entitled to an instruction of this nature except in situations where an erroneous view of the applicable law has become implanted in the jurors' minds. *Dipert v. State* (1972), 259 Ind. 260, 286 N.E.2d 405; *Stader v. State* (1983), Ind.App., 453 N.E.2d 1032.

Appellant argues the jury did have an erroneous view of the law due to the trial of John Hinckley which had concluded shortly before this trial commenced. She further maintains the recent enactment of the statute providing for a guilty but mentally ill verdict confused the jury as to the possible consequences of the verdict, not responsible by reason of insanity.

We find no merit in either argument. Appellant is engaging in mere speculation as to the effect of the Hinckley trial to the case at bar.

As to the statute allowing a finding of guilty but mentally ill, the court in its Final Instruction No. 3 covered such statute; however, in the same instruction the court stated the law as to the defense of insanity.

We hold the jury was properly instructed as to the defense of insanity. This Court has held that the statute, Ind.Code § 35-36-2-5, permitting a finding of "guilty but mentally ill" adds nothing to a finding of guilty. *Truman v. State* (1985), Ind., 481 N.E.2d 1089. However, the jury did not return a verdict of "guilty but mentally ill." The jury verdict was guilty as charged on both counts. Thus the question of "guilty but mentally ill" is not involved in the verdict in this case. We fail to see any prejudice to appellant stemming from instructions on insanity or mental illness.

▮ Appellant avers the trial court erred when it refused to give tendered Instruction No. 2. This instruction concerned the fact that appellant had entered a defense of insanity. The same subject matter was covered by the court's Instruction No. 3. The jury was instructed on the definitions of the crimes, including the mental elements, the presumption of innocence, the burden of proof and the fact the jury was to consider all of the evidence. We have said instructions are to be read together and construed as a whole. *Choate v. State* (1984), Ind., 462 N.E.2d 1037. It is not error to refuse an instruction when the substance of the instruction is adequately covered by the other instructions. *Kalady v. State* (1984), Ind., 462 N.E.2d 1299. The instructions given, taken as a whole, properly instructed the jury.

▮ Appellant argues the trial court erred when it refused a tendered jury instruction on the lesser offense of reckless homicide. She contends the jury could have properly concluded a death occurred but that appellant lacked the specific intent to commit the crime. Thus a verdict of reckless homicide, which has no specific intent element, would have been appropriate.

An instruction must be applicable under the evidence presented at trial. *Beasley v. State* (1983), Ind., 445 N.E.2d 1372. The evidence presented at trial reveals the victim struggled with her assailant, then a savage murder was accomplished and the body of the victim was mutilated. This evidence demonstrates an intentional act and not a reckless act. An instruction under these circumstances would have led to the possibility of an improper compromise verdict. *Beasley, supra.* The jury was properly instructed on the crimes of murder and burglary. There was no error in refusing to give the instruction.

Appellant contends the trial court erred when it gave the State's tendered Jury Instruction No. 1. The instruction provided:

"Among the witnesses who have appeared before you are some who have testified as expert witnesses. You are

not required to take the opinions of expert witnesses as binding upon you, but these opinions are to be used by you to aid in your deliberations. The testimony of experts is received as that of persons who are learned by reasons of special study investigation, or experience along lines not of general knowledge, and their conclusions may be of value to you. You may or may not adopt their conclusions, according to your own best judgment, giving to them in each instance such weight as you think should be given under the circumstances. You are to weigh the testimony of an expert witness in the same manner as you do the testimony of any of the witnesses."

This instruction, absent the last sentence, was approved by this Court in *Lynn v. State* (1979), 271 Ind. 297, 392 N.E.2d 449. The last sentence of this instruction was included in another of the *Lynn* instructions. Appellant argues the instruction is confusing, inconsistent, repetitive and singles out the testimony of the expert witness. We find nothing confusing, inconsistent or repetitive in the instruction. The instruction informs the jury of the proper perspective to be used to evaluate the testimony of the expert in relation to the other evidence. There was no error in the giving of this instruction.

The trial court is in all things affirmed.

DeBRULER and PIVARNIK, JJ., concur.

DICKSON, J., dissents with separate opinion in which SHEPARD, J., concurs.

DICKSON, Justice, dissenting.

A major issue in this case was the defendant's mental status at the time of the offense. In response to the filing of defendant's Notice of Defense of Mental Disease or Defect, the court appointed three (3) psychiatrists to examine the defendant, and then called them to testify at trial. Following examination by the court, the trial judge restricted each side to cross-examinations of twenty (20) minutes per side (fifteen minutes per side as to one of the psychiatrists). Such limitations of time for cross-examination, particularly as to the expert witnesses whose testimony critically impacts a crucial issue in the case, cannot be condoned. This is particularly true where the limitation is made in advance, thereby precluding any reasonable relationship to the substance of the issues counsel may desire to address in cross-examination. Imposing such an advance time limitation compels counsel to so constrict cross-examination, omitting areas of inquiry or refraining from proper follow-up questions, as to render meaningless any requirement that counsel await the expiration of the alotted time, and then pose further objection and offer of proof. I would find the advance time limitation in this case to be an unconstitutional denial of fair trial.

During the defense cross-examination of one of the psychiatrists, the court sustained the State's objections to a hypothetical question on grounds it did not require the opinion to be given "within a reasonable medical certainty." Notwithstanding the trial court's broad discretion in controlling examination of expert witnesses, this Court has expressly recognized that such "certainty" should not be a prerequisite for admissibility. In *Noblesville Casting Div. of TRW v. Prince* (1982), Ind., 438 N.E.2d 722, we explained:

Once the foundation has been established, the question remains whether an expert witness should be permitted to give an opinion or conclusion absent a requisite degree of certainty in the opinion or conclusion. In turn, if a degree of certitude is required, a companion question is presented: what degree of certitude—as defined in testimonial terms such as "possibly," "could have been," "educated guess," "probably," "more likely than not," "reasonable scientific certainty," "to a demonstrable certainty," or "inevitably"—should be demanded?

It is readily apparent that an attempt to quantify degrees of certitude in terms such as those employed by witnesses does, to some extent, inject semantics

into a matter of expert opinion testimony. The various phrases and words do not, in and of themselves, connote exact degrees of certainty or conclusiveness; usage of any particular term by an expert witness, as a consequence, may turn on the manner in which a question is propounded or the witnesses's subjective assessment of the meaning of the phrase or word used to express the opinion. See, e.g., *State v. Austin* (1976), 52 Ohio App.2d 59, 368 N.E.2d 59 (expert testified that he regarded "reasonable medical certainty" as up in the "ninety-nine point nine-nine percentage range").

At the same time, to hinge the question whether an expert's opinion is admissible and probative on the willingness and ability to say that such-and-such is "reasonably certain," as opposed to "probable" or "possible," is to impose on the expert a question which elevates the law's demand for certainty in language over the state of the particular art and the value of the advances made therein. Medicine, for example, is not yet an exact science; to demand reasonable certainty in medical opinions places a sometimes insurmountable barrier in the face of the candid and straightforward medical expert. * * * 438 N.E.2d at 727.

While the trial court may properly require a hypothetical question to disclose the degree of certainty or probability to be applied, the language of the majority opinion tends to obscure the proper standard. By approving the trial court's "reasonable medical *certainty*" restriction, the majority opinion would detract from and dilute the wisdom of the decision in *Noblesville Casting, supra.* This I oppose.

The trial court also refused to permit psychiatrists to testify regarding their expert opinions concerning the defendant's general intent at the time of the incident, as distinguished from her general ability to form intent and her general mental capacities at the time of the alleged crime. The majority opinion finds support for this distinction with the contention that the excluded opinion is improper expert testimony upon an ultimate issue for the jury. This

rationale is contrary to our decision in *Woods v. State* (1978), 267 Ind. 581, 372 N.E.2d 178:

> But the old rule that a witness may not give an opinion of an ultimate fact question has been abrogated in our State by *Rieth-Reiley Construction Co., Inc. v. McCarrell* (1975), Ind.App., 325 N.E.2d 844.

I cannot agree with the expressed reasoning of the majority opinion which would retreat from the above-expressed rule in *Woods,* as a general rule of evidence.

This problem is addressed in Rule 704 of the Federal Rules of Evidence, as follows:

> (a) except as provided in subsection (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it ambraces an ultimate issue to be decided by the trier of fact.
>
> (b) no expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Rather than the broad revision of the rule which may be inferred from the majority opinion, the approach of the federal rules of evidence is more reasonable. It would continue the present rule in general, but apply an exception which, in the instant case, would support the ruling of the trial court on this issue.

It should be noted however, that the trial court's direct examination of a psychiatrist had already opened the door to this line of questioning. The trial court asked the psychiatrist whether the defendant, at the time of the crime, had the capacity to appreciate the wrongfulness of her conduct or to conform her conduct to legal requirements. The psychiatrist responded that, in his opinion, the defendant lacked this capacity and was insane when the crime occurred. Therefore, whatever the propriety or basis

for the trial court's ruling on the cross-examination question, substantially the same evidence had already been presented during direct examination and the defense was not prejudiced by the ruling.

Finally, I dissent from the majority opinion with respect to the propriety of Preliminary Instruction 5:

> The rule of law which throws around the defendant the presumption of innocence, and requires the State to establish beyond a reasonable doubt, every material fact averred in the information is not intended to shield those who are actually guilty from just and merited punishment, but is a humane provision of the law, which is intended for the protection of the innocent, and to guard as far as human agencies can, against the conviction of those who are innocent and unjustly accused of crime.

This instruction is prejudicial and its use should be discouraged. While previous decisions may have granted tacit approval to its use, the instruction contains a potential for insidious interference with the right to fair trial. A jury receiving this instruction is likely to infer that the presumption of innocence applies only to innocent defendants, and not to those "actually guilty." In truth, the presumption does clothe all defendants with the presumption of innocence requiring guilt to be established beyond a reasonable doubt. In addition to creating a false impression regarding the presumption of innocence, the context of the instruction may suggest to some jurors that the defendant is being singled out as one of "those who are actually guilty" and who deserves "just and merited punishment." Jurors are likely to infer that, otherwise, the judge would not make such a statement.

If this instruction does not constitute reversible error in the instant case in view of the other instructions, we should at least condemn its use in future criminal cases.

SHEPARD, J., concurs.