

**FILED**
May 27 2015, 8:51 am

**CLERK**
of the supreme court,
court of appeals and
tax court

APPELLANT *PRO SE*

Kathy L. Siner
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
KINDRED HOSPITALS, DENNIS
NICELY, AND DAVID UHRIN

Melinda R. Shapiro
Libby Y. Goodknight
Lauren C. Sorrell
Krieg DeVault LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
MOHAMMED MAJID

Michael Roth
Brett T. Clayton
Eichhorn & Eichhorn, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kathy L. Siner, Personal
Representative of the Estate of
Geraldine A. Siner, Deceased,
and John T. Siner, prior
Enduring Power of Attorney and
Medical Representative of the
Deceased

*Appellants-Plaintiffs,*

v.

Kindred Hospital Limited
Partnership d/b/a Kindred
Hospital of Indianapolis, et al.,

May 27, 2015

Court of Appeals Case No.
49A05-1404-CT-165

Appeal from the Marion Superior
Court

The Honorable Heather Welch,
Judge

Cause No. 49D12-1305-CT-20123

Mohammed A. Majid, M.D.,
Dennis Nicely, David Uhrin,
RN.

*Appellees-Defendants*.

**Bradford, Judge.**

# Case Summary

In 2013, Appellants-Plaintiffs Kathy and John Siner (collectively "the Siners") brought a medical malpractice suit against Appellee-Defendant Kindred Hospital and its employees Appellees-Defendants Dennis Nicely and David Uhrin (collectively "Kindred") as well as Appellee-Defendant Dr. Mohammed Majid. The Siners alleged that Kindred and Dr. Majid (collectively the "Defendants") were negligent in their medical treatment of the Siners' mother, Geraldine Siner, resulting in her injury. The Siners filed their complaint after a medical review panel determined, in 2012, that the Defendants were negligent and that their negligence may have caused injury to Geraldine. The trial court granted separate motions for summary judgment in favor of Dr. Majid and Kindred, finding that the Siners had failed to designate evidence which created an issue of material fact with regards to whether Defendants' allegedly negligent conduct proximately caused injury to Geraldine. We affirm the trial court's grant of summary judgment with regards to Dr. Majid and reverse with regards to Kindred.

# Facts and Procedural History

[2]     October 26, 2007, eighty-six-year old Geraldine Siner became a patient at Kindred Hospital. Geraldine suffered from advanced dementia caused by Alzheimer's disease and as a result could no longer care for herself. Geraldine's son, John Siner, was designated as her health care representative and had power of attorney. Upon Geraldine's admission to Kindred, and several times thereafter, John informed Dr. Mohammad Majid, Geraldine's attending physician, that Geraldine was to be a 'full code' patient. On November 16, 2007, Kindred's Ethics Committee decided to make Geraldine a No Code/Do Not Resuscitate ("DNR") patient, meaning that Kindred staff would not attempt to resuscitate her in the event that she went into respiratory or cardiac arrest (otherwise known as "coding"). The Ethics Committee did not receive approval from John or any other family member to change Geraldine's status in this manner. Geraldine's health continued to decline over the following two weeks and Kindred declined to keep Geraldine on 'full code' status despite her family's protests.

[3]     As a result of their dissatisfaction with Kindred, the family had Geraldine moved from Kindred to Methodist Hospital on December 8, 2007. Geraldine required immediate treatment for a collapsed lung, "over-whelming infection, and septic shock at the time of intake." Appellant's App. p. 190. Geraldine died on December 28, 2007 while at Methodist Hospital.

[4] On November 10, 2009, Kathy Siner, Geraldine's daughter and personal representative of her estate, filed a medical malpractice claim against Defendants with the Indiana Department of Insurance. On December 17, 2012, a medical review panel determined, by unanimous opinion, "that the evidence supports the conclusion that the defendants failed to comply with the appropriate standard of care, and that their conduct may have been a factor of some resultant damages, but not the death of the patient." Appellee's App. p. 15.

[5] On May 6, 2013, the Siners filed a complaint against Defendants in Marion Superior Court. On September 12, 2013, one of the medical review panel members, Dr. James Krueger, provided an affidavit to clarify the reasoning behind his panel decision. In his affidavit, Dr. Krueger states that the only negligent care provided by Defendants was the prolonged use of a CPAP mask.[1] Dr. Krueger went on to state that upon further review, after the panel had rendered its decision, he learned that IU Pulmonary and Critical Care ("IU Pulmonary") directed Geraldine's pulmonary care during her hospitalization at Kindred and that "it was reasonable for Kindred to defer to the judgment of the Pulmonology Service as it related to Ms. Siner's pulmonary care. Therefore, it is my opinion that Kindred met the standard of care by consulting the

---

[1] CPAP, or continuous positive airway pressure, is a treatment that uses air pressure to keep the respiratory airways open and is typically used by patients having difficulty breathing. *What is CPAP?*, US Dep't of Health and Human Services. Nat'l Heart, Lung, and Blood Institute. (December 13, 2011). http://www.nhlbi.nih.gov/health/health-topics/topics/cpap (last visited March 27, 2015).

Pulmonology Service…." Appellee's App. p. 22. Dr. Krueger did not speak as to the opinion of the other two panel members.

[6] On September 3, 2013, Dr. Majid filed a motion for summary judgment arguing that there was no disputed material fact regarding causation and he designated the panel opinion and affidavit from Dr. Krueger as evidence. The Siners timely filed a response on November 1, 2013, but did not designate any expert witness evidence beyond the panel opinion. On November 19, 2013, the date of the hearing on Dr. Majid's motion, the Siners filed their belated designation of evidence. Because the evidence was designated belatedly, the trial court did not consider it pursuant to Indiana Trial Rule 56. On November 26, 2013, the trial court granted Dr. Majid's motion for summary judgment.

[7] On December 6, 2013, Kindred filed a motion for summary judgment which similarly argued that there was no genuine issue of material fact as to causation. The Siners filed a response and designated the affidavits of Drs. Timothy Pohlman and Lawrence Reed. Pohlman opined that the Defendants breached their duty of care in multiple respects and that Geraldine's injuries likely resulted from those breaches. On March 13, 2014, the trial court granted Kindred's motion for summary judgment reasoning that "neither [Pohlman nor Reed's] affidavit addresses the issue of causation of Geraldine Siner's injuries or death." Appellee's App. p. 107. The Siners now appeal both orders granting summary judgment.

# Discussion and Decision

# I. Standard of Review

On appeal, our standard of review is the same as that of the trial court: summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. We construe all facts and reasonable inferences drawn from those facts in favor of the non-moving party. On appeal, the trial court's order granting or denying a motion for summary judgment is cloaked with a presumption of validity. A party appealing from an order granting summary judgment has the burden of persuading the appellate tribunal that the decision was erroneous.

*Roberts v. Sankey*, 813 N.E.2d 1195, 1197 (Ind. Ct. App. 2004) (citations omitted).

A defendant is entitled to judgment as a matter of law when he shows that the undisputed material facts negate at least one element of the plaintiff's claim for relief. A court must grant summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Briggs v. Finley*, 631 N.E.2d 959, 963 (Ind. Ct. App. 1994) (citations omitted).

"In a medical negligence claim, the plaintiff must prove by expert testimony not only that the defendant was negligent, but also that the defendant's negligence proximately caused the plaintiff's injury." *Clarian Health Partners, Inc. v. Wagler*, 925 N.E.2d 388, 392 (Ind. Ct. App. 2010) (citing *Schaffer v. Roberts*, 650 N.E.2d 341, 342 (Ind. Ct. App. 1995)). The only issue facing this court is whether there is a genuine issue of material fact on the subject of causation. Defendants do not dispute that there is a factual issue regarding whether they breached their duty of care.

# II. Standard for Reliance on Expert Medical Testimony

In *Noblesville Casting Division of TRW, Inc. v. Prince*, 438 N.E.2d 722 (Ind. 1982), the Indiana Supreme Court addressed the standard for admissibility of expert witness evidence and the degree of certainty with which that evidence must be offered by the expert in order to support a verdict.[2] In *Noblesville Casting*, the plaintiff, Prince, aggravated a preexisting degenerative spinal condition while lifting heavy objects at work. *Id.* at 724. The sole expert testimony in the case had come from Prince's surgeon who testified that it was "possible" that the incident at work had aggravated his preexisting condition. *Id.* at 725.

> [W]e reiterate that no threshold level of certainty or conclusiveness is required in an expert's opinion as a prerequisite to its admissibility. Assuming the subject matter is one which is appropriate for expert testimony and that a proper foundation has been laid, the expert's opinion or conclusion that, in the context of the facts before the witness, a particular proposition is "possible," "could have been," "probable," or "reasonably certain" all serve to assist the finder of fact in intelligently resolving the material factual questions. The degree of certainty in which an opinion or conclusion is expressed concerns the weight to be accorded the testimony, which is a matter for the jury to resolve.
>
> Notwithstanding the probative value and admissibility of an expert's opinion which falls short of "reasonable scientific or medical certainty," we also reiterate that standing alone, an opinion which lacks reasonable certainty or probability is not sufficient evidence by itself to support a verdict.

---

[2] Both the majority and concurring opinions in *Noblesville Casting* received two votes, with one Justice not participating. Although the two opinions disagreed on the standard of admissibility for expert opinions, both agreed on the requisite level of certainty necessary for an expert opinion to support a verdict. As only the latter issue is relevant to this case, it is of no importance that there was no majority or plurality opinion.

* * *

Of course, an expert's opinion that something is "possible" or "could have been" may be sufficient to sustain a verdict or award when it has been rendered in conjunction with other evidence concerning the material factual question to be proved. No hard and fast rule can be stated; the matter is a factual one to be resolved on a case-by-case basis, depending upon the particular standards of proof or review which are applicable, as well as the evidence presented, including the expertise of the witness and the data and analytical methods upon which the opinion is based.

*Id.* at 731 (citations omitted). *See also Malooley v. McIntyre*, 597 N.E.2d 314, 318 (Ind. Ct. App. 1992) (plaintiff in a medical malpractice case must provide "evidence which tends to support the…allegation that there was a causative nexus between conduct and [injury].").

[11] The Court in *Noblesville Casting* instructed that courts should be careful not to elevate form over substance, or as the court phrased it, "elevate[] the law's demand for certainty in language over the state of the particular art and the value of the advances made" by the expert. 438 N.E.2d at 727.

"Medicine, for instance, is not yet an exact science; to demand reasonable certainty in medical opinions places a sometimes insurmountable barrier in the face of the candid and straightforward medical expert. New York's highest court explained:

Of course, one can pick out the words 'assumed' and 'possibly'. But this careful physician was saying all that an opinion expert could honestly say, that is that although there could not be certainty in such a case his professional judgment was that causality should and could be assumed and acted upon although in the nature of things it could never be scientifically proven or disproven.

> "Our function is not to reject opinion evidence because nonlawyer witnesses fail to use the words preferred by lawyers and Judges but to determine whether the whole record exhibits, as it does here, substantial evidence of aggravation ...." *Ernst v. Boggs Lake Estates*, (1963) 12 N.Y.2d 414, 416, 240 N.Y.S.2d 153, 154, 190 N.E.2d 528, 529.
>
> * * *
>
> What must be "reasonably certain," it has been recognized, is that the witness is in fact an expert and that the analytical and scientific methods employed are generally accepted in the particular community of expertise; in other words, "reasonable certainty" is primarily a formulation designed to guarantee the trustworthiness or reliability of the opinion offered, rather than the fact to be proved. *Boose v. Digate*, (1969) 107 Ill. App. 418, 246 N.E.2d 50; *State v. Wind*, (1973) 60 Wis.2d 267, 208 N.W.2d 357.

*Id*. at 727, 729.

[12] Ultimately, the Court held that the expert's testimony, despite being couched in speculative terms, was sufficient to support a verdict for Prince because it was supported by additional anecdotal evidence suggesting causation. *Id*. at 732. In a concurring opinion, Justice Pivarnik also found that the expert's testimony was sufficient to support the verdict. However, Justice Pivarnik reasoned that despite the expert's use of the speculative phrases "it is possible" and "it could be," his overall analysis connoted a higher level of certainty which was sufficient to support a verdict on its own. *Id*. at 738. [3]

---

[3] We note that the Defendants have cited to the cases *Colaw v. Nicholson*, 450 N.E.2d 1023, 1030 (Ind. Ct. App. 1983) and *Topp v. Leffers*, 838 N.E.2d 1027, 1033-1034 (Ind. Ct. App. 2005). These cases reiterate the standard provided in *Noblesville Casting*. However, the court in *Colaw* misquotes *Noblesville Casting*, and that misquotation is subsequently repeated in *Topp* and cited in Kindred's appellate brief.

[13] "Under Indiana law, the evidentiary standard required to establish the fact of causation in this matter is by a preponderance of the evidence." *Hardiman v. Davita Inc.*, 2007 WL 1395568, at \*13 (N.D. Ind. May 10, 2007) (citing *City of Indianapolis v. Parker*, 427 N.E.2d 456 (Ind. Ct. App. 1981)). The rule outlined in *Noblesville Casting* "is simply a counterpart to the standard and burden of proof." 438 N.E.2d at 731. Accordingly, an expert opinion must serve to overcome this standard in order to support a verdict. Expert opinions offered with reasonable medical certainty (in terms of their scientific/methodological reliability) which opine that a given injury was "probable" or "more likely than not" caused by defendant's actions, fulfill the plaintiff's burden to meet the preponderance standard, and may support a verdict standing alone. *Id.*; *See also Hardiman*, 2007 WL 1395568, at \*15 ("Thus, admissible medical expert testimony must only be more conclusive than "possibility" when it stands alone as proof of proximate causation." (quotation omitted)). Expert opinions that are, overall, speculative in nature are generally not sufficient to support a

> *Noblesville Casting* held that expert medical opinion couched in terms less than that of a reasonable degree of medical certainty; such as "possible," "probable," or "reasonably certain," are admissible and do have probative value. However, such medical testimony standing alone, unsupported by other evidence, is not sufficient to support a verdict....

*Colaw*, 450 N.E.2d at 1030; *Topp*, 838 N.E.2d at 1033-34. This is not the standard enunciated in *Noblesville Casting*. It is correct that medical opinions using speculative terms such as "possible" will *generally* be insufficient, absent additional evidence, to support a verdict. However, the terms "probable" and "reasonably certain" were specifically referenced in *Noblesville Casting* as being sufficient to support a verdict standing alone. *See Id.* at 731. ("we also reiterate that standing alone, an opinion which lacks reasonable certainty or probability is not sufficient evidence by itself to support a verdict.")

verdict absent additional supporting evidence. *Topp*, 838 N.E.2d at 1035; *Noblesville Casting*, 438 N.E.2d at 731.

# III. Analysis

## A. Kindred Defendants

[14] Kindred argues that the Siners failed to designate any evidence which indicates that its purportedly negligent acts caused Geraldine's injuries or death. The trial court adopted this conclusion in its order granting summary judgment.

> The Plaintiff designated the Affidavits of Dr. Timothy H. Pohlman and Lawrence Reed. Both of these physicians do opine that the Defendants found that there was practice below the standard of care. However, neither affidavit addresses the issue of causation of Geraldine Siner's injuries or death.

Appellee's App. p. 107.

[15] However, it appears that Dr. Pohlman's affidavit did in fact opine that the Defendants' allegedly negligent standard of care caused injury to Geraldine.

> 3. On December 8, 2007, Geraldine A. Siner was transferred from Kindred Hospital to Methodist Hospital's ICU…. The patient required intubation and immediate bronchoscopy for left atelectasis (collapsed lung) which I found on initial imaging studies. I recall Gerri Siner's family expressed shock when informed of her collapsed lung, saying that Kindred Hospital had not informed them of this. According to patient records obtained from Kindred Hospital, the left lung atelectasis was known on December 5, 2007. In my opinion that the lack of timely resolution of the lung collapse on December 5, 2007 represents a deviation from the Standard of Care.
>
> 4. I recall that Gerri Siner had wounds on her cheeks indicating the prolonged use of a BiPAP mask, which were documented by our 'wound team. In my opinion, the prolonged use of BiPAP and CPAP

to the point of facial wounds, constitutes a breach in the accepted Standard of Care. Adverse effects of non-invasive ventilation such as pressure necrosis on the face…. The development of pressure necrosis is one factor that can limit the tolerance and duration of noninvasive ventilation, and requires continuous readjustment of the mask. There is no clinical record that this occurred at Kindred Hospital for this patient.

5. Moreover, continuing CPAP was recommended because alternative treatments "*such as tracheotomy and intubation were not appropriate in a terminal patient*." [emphasis in original] However, the designation of 'terminal patient' is typically made by a patient's attending physician, and not by a division such as 'Pulmonary Services.' Further, Kindred's Ethics Committee recommended over-riding the wishes of the family and instructions of the patient's medical representative for full treatment, and instituted Do Not Resuscitate (DNR) order, which ruled out such alternative treatments.

6. Methodist records document that Gerri Siner was also suffering from over-whelming infection, and septic shock at the time of intake. There is no documentation produced for me that indicate SCCM Surviving Sepsis Guidelines, even from 2004, were followed (**Crit Care Med**, 2004;32:858-73). These guidelines were not followed apparently because the patient was under a DNR order. This is an additional breach in the Standard of Care.

7. *Full damages and suffering that more likely than not resulted from re-prioritization of treatment modalities for Gerri Siner* based on her existing 'DNR' order that was left in place without full agreement and consent of her Surrogate decision makers would warrant reassessment of her care at Kindred Hospital. [emphasis added]

Appellant's App. pp. 189-91. In sum, Dr. Pohlman opined that Geraldine suffered facial wounds as a result of a breach in the accepted standard of care. He goes on to state that Kindred's DNR order likely led to additional damages and suffering caused by failure to properly treat Geraldine's collapsed lung, infection, and sepsis.

[16]  In contrast to the trial court's order, Dr. Pohlman's affidavit does address the issue of causation. Furthermore, in light of Dr. Pohlman's analysis on the whole, and by his statement that the negligent DNR order "more likely than not" resulted in damages and suffering, we think the affidavit meets the standard outlined in *Noblesville Casting* for sufficiency to support a verdict. Therefore, the affidavit did create a material issue of fact and so the trial court erred in granting Kindred's motion for summary judgment.

[17]  Kindred briefly points to the fact that IU Pulmonary directed Geraldine's pulmonary care during her hospitalization at Kindred and that Dr. Krueger found that it was reasonable for Kindred to rely on IU Pulmonary for decisions regarding Geraldine's pulmonary treatment. However, this argument only goes to Kindred's alleged negligent use of the CPAP mask and does not change the fact that there is a factual dispute regarding Kindred's decision to impose a DNR order for Geraldine, a decision which was unrelated to her pulmonary care.

[18]  Furthermore, we find Dr. Krueger's affidavit to be considerably suspect. After hearing evidence presented by both parties, Dr. Krueger, along with two other members of the medical review panel, unanimously determined that the Defendants breached their respective standards of care and may have caused injury to Geraldine. Seven months later, Dr. Krueger offered an affidavit which opined that Defendants had *not* breached their duties of care. This affidavit was based on Dr. Krueger's further review of unspecified medical records. Dr. Krueger provided no insight as to what prompted his subsequent review of the

case, what medical records were reviewed, or why those records led him to a different conclusion than during his initial review as part of the medical review panel. Nevertheless, the medical panel's decision was inconclusive regarding causation, so the burden was on the Siners to offer evidence sufficient to create a material issue of fact on causation. As such, the Defendants were under no duty to offer such evidence and the existence of Dr. Krueger's affidavit, valid or not, is irrelevant to our decision. *See Clarian Health Partners, Inc. v. Wagler*, 925 N.E.2d 388, 393 (Ind. Ct. App. 2010) (A medical review panel's opinion stating that it cannot determine from the evidence whether a defendant's conduct caused the injury to patient affirmatively negates the causation element and shifts to the patient the burden of demonstrating the existence of a genuine issue of material fact as to causation).

## B. Dr. Majid

[19] The Siners did not obtain or designate Dr. Pohlman's affidavit as evidence with regards to Dr. Majid's motion for summary judgment. The only expert witness evidence designated by the Siners was the medical review panel's opinion which stated that the Defendants' conduct "may have been a factor of some resultant damages, but not the death of the patient." Appellee's App. p. 15. Dr. Majid claims that such an opinion, standing alone, is insufficient to gain a verdict for medical malpractice. We agree.

[20] The medical review panel's determination that "[Defendants'] conduct may have been a factor of some resultant damages" is a clear example of a speculative expert opinion which does not establish causation with reasonable

certainty or probability. The three-sentence panel opinion lacks any context with which a higher degree of certainty might be gleaned and the Siners did not designate any additional supporting evidence. As such, the medical panel opinion is not sufficient to support a verdict under the *Noblesville Casting* standard. "A court must grant summary judgment…against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Briggs*, 631 N.E.2d at 963. Therefore, the medical panel opinion did not create an issue of material fact regarding causation sufficient to preclude Dr. Majid's motion for summary judgment.

[21] The judgment of the trial court is affirmed in part and reversed in part.

Vaidik, C.J., concurs.
Kirsch, J., concurs in part and dissents in part with opinion.

| | |
|---|---|
| Kathy L. Siner, Personal Representative of the Estate of Geraldine A. Siner, Deceased, and John T. Siner, prior Enduring Power of Attorney and Medical Representative of the Deceased | Court of Appeals Case No. 49A05-1404-CT-165 |
| *Appellants-Plaintiffs,* | |
| v. | |
| Kindred Hospital Limited Partnership d/b/a Kindred Hospital of Indianapolis, et al., Mohammed A. Majid, M.D., Dennis Nicely, David Uhrin, RN. | |
| *Appellees-Defendants.* | |

**KIRSCH, Judge,** *concurring in part and dissenting in part*.

I fully concur in the decision to reverse the trial court's grant of summary judgment with regard to the Kindred defendants, but I respectfully dissent form the decision to affirm the grant of summary judgment for Dr. Majid.

The basis of my dissent is two-fold:

First and foremost, I think that there are material questions of fact regarding whether Dr. Majid breached the applicable standard of care in his treatment of Geraldine Siner and whether such breach was a factor in the resultant damages. Second, I find it troubling that a single member of a Medical Review Panel can undermine the work of the panel of which he was a part by an *ex parte* and conclusory affidavit executed months after the fact without procedural safeguards.

The affidavit of James R. Krueger, M.D. was signed more than eight months after the Medical Review Panel convened and heard the evidence presented by the parties and their counsel and nearly seven months after it rendered its unanimous opinion. In his affidavit, Dr. Krueger states that "Since rendering my panel opinion, I have had the opportunity to review the medical records of Geraldine Siner in greater detail." Dr. Krueger does not state which medical records he reviewed. Thus, we do not know whether he reviewed all of her records, all of the records introduced at the hearing and presented to the panel, or records which were not introduced at the hearing. We do not know the nature of such medical records, nor whether they met the relevancy and authentication standards for admission into evidence. Indeed, we have no

knowledge about "the medical records" that Dr. Krueger reviewed "in greater detail."

[26] Similarly, we do not know the circumstances prompting Dr. Krueger's further review. We do not know why, where or when it occurred, and we do not know who, if anyone, was present. We do not know how long Dr. Krueger spent reviewing the selected records "in greater detail." We do not know whether Dr. Krueger drafted his affidavit or whether it was drafted by someone else.

[27] All that we do know about Dr. Krueger's opinion is that there is a contradiction between the opinion that Dr. Krueger rendered as a medical expert serving on the Medical Review Panel in this case and the one which he gave several months later. As a result, one of the three medical experts serving on the Medical Review Panel in this case had certain reservations about his opinion as a result of his later private review of certain of Ms. Siner's medical records outside the purview of the Panel without the opportunity for authentication of the records or cross-examination.

[28] From my perspective, one member of a Medical Review Panel cannot undermine the statutorily-prescribed Medical Review Panel process. At most, there is simply a question of material fact arising from the Medical Review Panel Opinion on one hand stating unanimously that "the evidence supports the conclusion that the defendants failed to comply with the appropriate standard of care, and that their conduct may have been a factor of some resultant damages, but not the death of the patient" and Dr. Krueger's later

opinion that "Dr. Majid met the standard of care and did not cause any injury to Geraldine Siner in connection with CPAP application." Had Dr. Krueger held his later opinion at the time that the Medical Review process was conducted and voted accordingly, the panel vote would have been two to one. To me, the fact that Dr. Krueger issued a different opinion several months after the process is immaterial. The expert medical opinion arising from the Medical Review process remains that Dr. Majid "failed to comply with the appropriate standard of care, and that [his] conduct may have been a factor of some resultant damages, but not the death of the patient."

[29] The second basis from my dissent rises from the fact that the Medical Review process was created by our General Assembly. That process is mandated in nearly all legal proceedings alleging medical malpractice. The process includes a number of mandated procedural and evidentiary safeguards to protect the rights of all parties to the proceeding. That process should not be impeached or undermined months after it is concluded by an affidavit from a member of the panel issued without those procedural safeguards.